1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA,     )
                              )
        Plaintiff,            )
                              )
and                           )
                              )
                              )
                              )
FLUOR HANFORD INC., and       )
TRI-CITY INDUSTRIAL           )
DEVELOPMENT COUNCIL           )
                              )
        Intervenor-Plaintiffs. )
                              )
v.                            )
                              )
JAY MANNING, in his official  )
capacity as Director of the   )
Washington Department of Ecology, )
the WASHINGTON DEPARTMENT )
OF ECOLOGY, and the STATE OF  )
WASHINGTON,                   )
                              )
        Defendants,           )
                              )
and                           )
                              )
YES ON I-297: PROTECT         )
WASHINGTON, et al.,           )
                              )
        Intervenor-Defendants. )

NO. CV-04-5128-AAM

**ORDER GRANTING
MOTION FOR SUMMARY
JUDGMENT,** *INTER ALIA*

**BEFORE THE COURT** is the Motion For Summary Judgment filed by the
United States of America (United States) (Ct. Rec. 136), joined in by Fluor
Hanford (Fluor) and the Tri-City Industrial Development Council (TRIDEC). Also
before the court is TRIDEC's Motion For Partial Summary Judgment (Ct. Rec.
140).

**ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT-**    1

1    Oral argument was heard on May 23, 2006.  Kenneth C. Amaditz, Esq., and

2    David Kaplan, Esq., presented argument on behalf of the United States.  Matthew

3    J. Segal, Esq., presented argument on behalf of intervenor-plaintiff TRIDEC.

4    Colin Deihl, Esq., presented argument on behalf of intervenor-plaintiff Fluor.

5    Andrew A. Fitz, Esq., and Laura J. Watson, Esq., presented argument on behalf of

6    the State of Washington (State) defendants.  Michael J. Robinson-Dorn, Esq., and

7    Gerald M. Pollet, Esq., presented argument on behalf of intervenor-defendants.

8

9    **I. BACKGROUND**

10    The United States, TRIDEC, and Fluor (collectively referred to herein as

11    "plaintiffs") challenge the constitutionality of Washington's Cleanup Priority Act

12    (CPA)[1], RCW Chapter 70.105E, enacted into law pursuant to Initiative 297 (I-297)

13    passed by Washington voters in the November 2004 election.  They seek a

14    declaration that the CPA is invalid in its entirety, alleging it: 1) violates the

15    Supremacy Clause of the United States Constitution (Article VI, Clause 2); 2)

16    violates the sovereign immunity of the United States; and 3) violates the dormant

17    Commerce Clause of the United States Constitution (Article I, Section 8, Clause 3).

18    In addition, TRIDEC asserts the CPA violates the Contract Clause of the United

19    States Constitution (Article I, Section 10).

20    The stated purpose of the CPA, RCW 70.105E.010 (Section 1), is:

21    [T]o prohibit sites at which mixed radioactive and hazardous
     wastes have contaminated or threaten to contaminate the
22    environment, **such as at the Hanford Nuclear Reservation**,
     from adding more waste that is not generated from the cleanup
23    of the site until such waste on-site has been cleaned up and is
     stored, treated, or disposed of in compliance with all state and
24    federal environment laws.

25    (Emphasis added).

26    To that end, the CPA requires mixed waste facilities, such as the Hanford

27    _____

28    [1]  A "Glossary Of Selected Acronyms" is appended to this order at p. 62.

**ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT-    2**

Nuclear Reservation (Hanford), to obtain a final facility permit under the federal Resource and Conservation Recovery Act of 1976 (RCRA), 42 U.S.C. §§6901-6992k, and state law, and to meet all closure and corrective action requirements before the facility may accept any additional mixed wastes not generated at the facility. For mixed waste facilities that have been granted a sitewide permit, such as Hanford, final facility permits must be applied for and obtained for each unit or facility within the site where mixed wastes are, or will be, stored or disposed, prior to transporting to, storing or disposing at the facility any additional mixed wastes not generated at the facility. RCW 70.105E.040(2) and (6)[Section 4(2) and (6)][2]. The Hanford Site currently does not have a final facility permit for each unit or facility within the site.

This court certified certain questions to the Washington Supreme Court regarding interpretation of the CPA. On July 28, 2005, the state supreme court provided answers to those questions, with the exception of the question relating to severability. *United States v. Hoffman*, 154 Wn.2d 730, 116 P.3d 999 (2005).[3] The answers to those questions are discussed in detail *infra*.

Enforcement of the CPA is currently restrained pursuant to order of this court.

## II. SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Zweig v. Hearst Corp.*, 521 F.2d 1129

---

[2] Section 4 of the CPA is titled "Duties of the department of ecology to regulate mixed wastes."

[3] This court wishes to express its gratitude to the state supreme court for its clear, concise and prompt responses which were of considerable assistance in resolving the issues here.

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT**-    3

1  (9th Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469 (1975).  Under Fed. R. Civ. P.
2  56, a party is entitled to summary judgment where the documentary evidence
3  produced by the parties permits only one conclusion.  *Anderson v. Liberty Lobby,*
4  *Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505 (1986); *Semegen v. Weidner*, 780 F.2d
5  727, 732 (9th Cir. 1985).  Summary judgment is precluded if there exists a genuine
6  dispute over a fact that might affect the outcome of the suit under the governing
7  law.  *Anderson*, 477 U.S. at 248.
8       The moving party has the initial burden to prove that no genuine issue of
9  material fact exists.  *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475
10  U.S. 574, 586, 106 S.Ct. 1348 (1986).  Once the moving party has carried its
11  burden under Rule 56, "its opponent must do more than simply show that there is
12  some metaphysical doubt as to the material facts."  *Id*.  The party opposing
13  summary judgment must go beyond the pleadings to designate specific facts
14  establishing a genuine issue for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325,
15  106 S.Ct. 2548 (1986).
16       In ruling on a motion for summary judgment, all inferences drawn from the
17  underlying facts must be viewed in the light most favorable to the nonmovant.
18  *Matsushita*, 475 U.S. at 587.  Nonetheless, summary judgment is required against a
19  party who fails to make a showing sufficient to establish an essential element of a
20  claim, even if there are genuine factual disputes regarding other elements of the
21  claim.  *Celotex*, 477 U.S. at 322-23.
22
23  **III.  DISCUSSION**
24       **A.  Supremacy Clause**
25       The Supremacy Clause mandates that "the laws of the United States . . . shall
26  be the supreme Law of the Land; and the Judges in every State shall be bound
27  thereby, any Thing in the Constitution or Laws of any State to the Contrary
28  notwithstanding."  U.S. Const., Art. VI, Cl. 2.

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT-**    4

**1. Preemption**

> [S]tate law can be preempted in either of two general ways. If Congress evidences an intent to occupy a given field, any state law falling within that field is preempted. If Congress has not entirely displaced state regulation over the matter in question, state law is still preempted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress.

*Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615 (1984).

Plaintiffs contend the CPA is an attempt to regulate radioactive materials for safety purposes and therefore, falls within the field of regulation preempted by the Atomic Energy Act (AEA) of 1954, 42 U.S.C. §§ 2011-2297g-4. Furthermore, they contend the CPA stands as an obstacle to maintaining exclusive federal control over the management and disposal of radioactive materials. The AEA covers three different classes of radioactive material: source material, special nuclear material, and byproduct material. 42 U.S.C. § 2014(e), (z), (aa). The radioactive material at Hanford, or proposed to be sent there, consists of AEA radionuclides, either in "pure" form, or as a component of mixed waste (the other component being hazardous material).[4]

In *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 212, 103 S.Ct. 1713 (1983), the United States Supreme Court stated unequivocally that "[t]he federal government has occupied the **entire field of nuclear safety concerns**, except the limited powers expressly ceded to the states." (Emphasis added). Thus, for example, "[a] state moratorium grounded in

---

[4] Counsel for the State indicated during oral argument that the State has not exerted jurisdiction over non-AEA radionuclides at Hanford because there are none.

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT-** 5

safety concerns falls squarely within the prohibited field." *Id*. at 213.[5] In a subsequent opinion in *English v. General Elec. Co.*, 496 U.S. 72, 110 S.Ct. 2270 (1990), the Court clarified, but did not narrow, its holding in *Pacific Gas*, stating:

> [N]ot every state law that in some remote way may affect the nuclear safety decisions made by those who build and run nuclear facilities can be said to fall within the pre-empted field. . . . **Instead, for a state law to fall within the pre-empted zone, it must have some direct and substantial effect on the decisions made by those who build or operate nuclear facilities concerning radiological safety levels**.

*Id*. at 85 (emphasis added). [6]

The pre-empted field is defined, in part "by reference to the motivation

---

[5] In *Pacific Gas*, the Court concluded that a non-safety rationale supported California's moratorium on the construction of new nuclear power plants in California pending development of a plan for disposal of nuclear waste. This non-safety rationale was the economic costs of allowing such construction before adequate spent nuclear fuel storage facilities could be developed. 461 U.S. at 216. The Court also concluded the moratorium did not conflict with the objectives of the AEA because although a primary purpose of the AEA is the promotion of nuclear power, that power is not to be developed at "all costs." *Id*. at 222.

[6] *English* and *Silkwood*, cited *supra*, are among those cases which found that the state law in question did not have a direct and substantial effect on decisions of the United States concerning radiological safety levels. In *English*, the Supreme Court concluded there was no AEA preemption of a state tort law claim related to a "whistleblower" safety complaint at a nuclear facility. In *Silkwood*, the Court concluded a punitive damage award in a state action arising out of a plutonium leak from a nuclear facility was not preempted.

In *Skull Valley Band of Goshute Indians v. Nielson*, 376 F.3d 1223, 1247 (10th Cir. 2004), the Tenth Circuit distinguished those cases, explaining that *"Silkwood* and *English*[] both involve generally applicable state tort law that existed before Congress began to regulate nuclear power. [Citation omitted]. Neither case concerns state laws that target the nuclear industry, as the Utah provisions do here."

**ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT-    6**

behind the state law." *Id*. at 84. [7]   That motivation is relevant is confirmed by the AEA which provides that "nothing . . . shall be construed to affect the authority of any State or local agency to regulate activities **for purposes other than protection against radiation hazards**." *Id*., quoting 42 U.S.C. §2021(k)(1982 ed.)(emphasis added).  The other part which defines the preempted field of the AEA is the actual effect of a state law on nuclear safety.  Thus, even if a state law were not motivated by radiological safety concerns, it would still be preempted if it so related to radiological safety as to effectively infringe upon the field preempted by the AEA. *Id*. at 85.[8]

### a.  Regulation of "Pure" AEA Radionuclides

The State and the intervenor-defendants (collectively referred to herein as the "defendants") acknowledge that at least one provision of the CPA, RCW 70.105E.050(1) [Section 5(1)], seeks to "directly" regulate "pure" AEA radioactive material for radiological safety reasons.[9]  Section 5(1) provides:

_____

[7] See also *Skull Valley Band*, 376 F.3d at 1252, which cited *English* in affirming the district court which had examined the legislature's motive in passing certain statutes which it concluded were enacted for reasons of radiological safety, and therefore preempted by the AEA.  "Road Provisions" were deemed preempted based on a comment of a state legislator who sponsored the provisions that they established a "moat" around the proposed [Spent Nuclear Fuel] site, as well as a comment by the Governor that the provisions "will add substantially to our ability as a state to protect the health and safety of our citizens against the storage of high-level nuclear waste."

[8] This is not to be confused with conflict preemption which is a separate inquiry.

[9] Section 5 is titled "Releases of radioactive substances- Clean-up standards."  The State does not dispute that Section 5(1) exceeds RCRA's waiver of sovereign immunity to the extent that it regulates the cleanup of AEA

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**-    7

The department[10] shall consider **releases or potential releases, of radioactive substances or radionuclides as hazardous substances if the radioactive substance** poses a risk of a carcinogenic, toxic, or any other adverse health or environmental effect. The department shall require **corrective action** for, or remediation of, such releases to meet the same health risk based minimum clean-up standards as adopted for other carcinogenic, toxic, or other hazardous substances posing similar risks pursuant to RCW 70.105D.030 [Model Toxics Control Act].[11]

(Emphasis added).

The defendants contend, however, that Section 5(1) lies outside AEA's preempted field because "no court has directly addressed whether the AEA preempts a statute such as the CPA, which directly regulates AEA radionuclides only in the context of cleaning up uncontrolled environmental releases."

The AEA regulates nuclear material, regardless of whether it is considered waste. *Legal Environmental Assistance Foundation, Inc. v. Hodel*, 586 F.Supp. 1163, 1167 (1984). 42 U.S.C. §2014(e) defines "byproduct material" as (1) any radioactive material (except special nuclear material) yielded in or made radioactive by exposure to the radiation incident to the process of producing or utilizing special nuclear material, and (2) the tailings or wastes produced by the extraction or concentration of uranium and thorium from any ore processed primarily for its source material content. This court cannot discern any significance in the distinction between waste that is "uncontrolled" versus "controlled" with regard to radiological safety levels and nuclear safety concerns. The plain language of Section 5(1) of the CPA belies any significance since it

---

radionuclides, but asserts this regulation is not preempted by the AEA itself.

[10] Washington State Department of Ecology

[11] RCW Chapter 70.105D is the State's "Hazardous Waste Cleanup-Model Toxics Control Act [MTCA]." It is the State's version of the federal cleanup law, CERCLA (Comprehensive Environmental Response, Compensation, and Liability Act), 42 U.S.C. §9601 et seq.

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**-    8

seeks to regulate not simply "releases," but "potential releases" as well.[12]   Releases of AEA material implicate radiological safety just as much, if not more so, than unreleased AEA material.  The concern of Section 5(1) with "uncontrolled" environmental releases of AEA materials constitutes a "nuclear safety concern" and it has a direct and substantial effect on the decisions of those who operate nuclear facilities, such as the United States Department of Energy (DOE) at Hanford, concerning radiological safety levels.  The "entire field of nuclear safety concerns" includes "uncontrolled" releases of AEA material.[13]

Defendants contend nothing in the AEA, its legislative history, in Nuclear Regulatory Commission regulations, or DOE internal orders specifically addresses cleanup of "uncontrolled" releases of radionuclides.  Even assuming that is true, considering how long the AEA has been in existence, it is difficult to fathom that an issue about permissible state regulation of "uncontrolled" releases of AEA radionuclides would not have come to the fore until now.   In this regard, it is noted that it took the Federal Facility Compliance Act of 1992 (FFCA) to make it unmistakably clear that states could apply their solid and hazardous waste laws at

[12] The Washington State Supreme Court determined that the CPA is not limited to "hazardous substances" that have been released or pose a threat of future release to the environment. *Hoffman*, 154 Wn.2d at 740.  As discussed *infra*, the CPA's definition of "hazardous substances" includes AEA radionuclides

[13] The "entire field of nuclear safety concerns" undoubtedly includes "controlled" releases.  In *Northern States Power Company v. State of Minnesota*, 447 F.2d 1143 (8th Cir. 1971), the Eighth Circuit Court of Appeals held the United States had sole authority to regulate radioactive waste releases from nuclear power plants to the exclusion of states.  "We cannot agree with Minnesota's position that dual control over atomic power plants and the level of effluents discharged therefrom is permissible under the [Atomic Energy] Act."  *Id*. at 1149.  The Eighth Circuit's decision was summarily affirmed by the U.S. Supreme Court, 405 U.S. 1035, 92 S.Ct. 1307 (1972).

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT**-    9

1    federal facilities, including those "respecting control and **abatement** of solid waste
2    or hazardous waste disposal." 42 U.S.C. §6961(a)(emphasis added).[14]  And yet the
3    balance of the RCRA also makes it unmistakably clear that RCRA has no
4    application to AEA radionuclides.  42 U.S.C. §6903(27); §6905(a)(AEA
5    radionuclides excluded from definition of "solid waste" of which hazardous waste
6    is a subset).  Considering RCRA and the preemption case law discussed above, this
7    court is not persuaded that the AEA does not also preempt state regulation of
8    "uncontrolled" AEA radionuclides released to the environment.

9        The State contends the role of CERCLA as the federal  framework for
10   addressing the cleanup of released radionuclides proves that the field occupied by
11   the AEA does not include such cleanup.   This court disagrees.  Nothing in
12   CERCLA authorizes states to regulate within the field of nuclear safety concerns
13   preempted by the AEA.

14       CERCLA authorizes the President of the United States  to undertake cleanup
15   actions, or to obtain injunctive relief requiring responsible parties to undertake
16   such actions.  42 U.S.C. §§9604 and 9606.  The President is authorized to enter
17   into cooperative agreements with States to carry out actions authorized by §9604.
18   42 U.S.C. §9604(d)(1)(A).  42 U.S.C. §9620(a)(4) of CERCLA subjects federal
19   facilities that are not on the National Priorities List (NPL) to "state laws
20   concerning removal and remedial action."  Most of the Hanford Site is on the NPL.
21   In any event, §9620(a)(4) does not provide an unequivocal, clear, or unambiguous
22   authorization for States to regulate AEA materials released at federal facilities.[15]

23
24       [14] The FFCA amended RCRA and waived sovereign immunity for fines and
25   penalties for RCRA violations at federal facilities.
26
27       [15] 42 U.S.C. 9620(a)(4) provides:
28
         State laws concerning removal and remedial action, including

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT**-    10

1    The Supremacy Clause shields federal activities from state regulation absent

2    clear and unambiguous congressional consent. *Goodyear Atomic Corp. v. Miller*,

3    486 U.S. 174, 180 & n. 1, 108  S.Ct. 1704 (1988)("[B]ecause the Supremacy

4    Clause immunizes the activities of the Federal Government from state interference

5    . . ., direct state regulation of federal facilities is allowed only to the extent that

6    Congress has clearly authorized such regulation").  The principle of sovereign

7    immunity similarly shields federal facilities from lawsuits absent a clear and

8    unambiguous, "unequivocally expressed," congressional waiver allowing such

9    suits. *United States v. Mitchell*, 445 U.S. 535, 538, 100  S.Ct. 1349 (1980).

10    "[W]here Congress does not affirmatively declare its instrumentalities or property

11    subject to regulation, the federal function must be left free of regulation." *Hancock*

12    *v. Train*, 426 U.S. 167, 179, 96 S.Ct. 2006 (1976).  There is no reference to the

13    AEA in §9620(a)(4), and by the time this CERCLA provision was added in 1986,

14    the broad preemptive scope of the AEA had already been established via such

15    cases as *Pacific Gas* (1983).

16        This court also agrees with the United States that the "corrective action"

17    referred to in Section 5(1) is pursuant to RCRA authority.  See 42 U.S.C. §6924.

18    As noted, AEA radionuclides are specifically exempted from RCRA pursuant to 42

19

20    ────────────

21            State laws regarding enforcement, shall apply to removal and
         remedial action at facilities owned or operated by a department,
22        agency, or instrumentality of the United States or the facilities
         that are the subject of a deferral under subsection (h)(3)(C)
23        of this section when such facilities are not included on the
         National Priorities List.  The preceding sentence shall not
24
25        apply to the extent a State law would apply any standard or
         requirement to such facilities which is more stringent than
26        the standards and requirements applicable to facilities which
         are not owned or operated by any such department, agency or
27        instrumentality.
28

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT-    11**

U.S.C. §§ 6903(27) and 6905(a).  42 U.S.C. §9620(a)(4) of CERCLA does not refer to "corrective action,"instead referring to "removal and remedial action,"  nor does it make reference to any of RCRA's permitting requirements.  As such, §9620(a)(4) cannot be read to waive immunity for such "corrective action" or permitting requirements.  Moreover, 42 U.S.C. §9620(i) of CERCLA provides that "[n]othing in [section 120] shall affect or impair the obligation of any department, agency, or instrumentality of the United States to comply with any requirement of the [RCRA], [42 U.S.C. §6901 et seq.] (including any corrective action requirements)."

Section 5(1)'s "direct" regulation of "pure" AEA radionuclides is not outside the field of regulation preempted by the AEA.[16]

_____

[16] There are actually other instances of "direct" regulation of "pure" AEA radionuclides in the CPA, including RCW 70.105E.050(2) (Section 5(2)) ("[Ecology] shall include all known or suspected human carcinogens, **including radionuclides and radioactive substances**, in calculating the applicable clean-up standard, **corrective action level**, or maximum allowable projected release from a landfill or other facility or unit at which mixed wastes are stored, disposed, or are reasonably believed by the department to be present . . . .")(Emphasis added); RCW 70.105E.040(6)(b) (Section 4(6)(b)) ("The prohibitions of this subsection (6) against granting or modifying a permit apply whenever a release of a hazardous substance, **including but not limited to releases of radionuclides** and any other carcinogenic substances, has occurred at a site or facility . . . ." (Emphasis added); RCW 70.105E.060(2)(b) (Section 6(2)(b)) ("At any site with one or more land disposal facilities or units containing unlined trenches or pits, at which mixed wastes are stored or were disposed, any proposed expansion of such land disposal facility or unit, or application to permit new land disposal facilities at the same site, shall be considered to be an impermissible expansion of the

existing units or facilities where . . . (b) A release of a hazardous substance has occurred, including but not limited to **releases of radioactive or mixed wastes** . . . . ")(Emphasis added).

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT-**    12

1

### b. Regulation of Hazardous Waste and Mixed Waste

2      The defendants assert that other than Section 5(1) of the CPA, all of the

3 other provisions of the CPA are pursuant to the State's RCRA authority to manage

4 the hazardous component of mixed waste, the other component being AEA

5 radionuclides.

6      Before the CPA existed, the State was involved in the regulation of the

7 hazardous component of mixed waste at Hanford pursuant to its Hazardous Waste

8 Management Act (HWMA), RCW Chapter 70.105.  RCRA allows states to apply

9 for United States Environmental Protection Agency (EPA) authorization to

10 administer a hazardous waste program.  42 U.S.C. §6926(b).  In order to receive

11 this authorization, a state hazardous waste program must be "equivalent" to the

12 RCRA Subtitle C (42 U.S.C. §§ 6921-6939e) program established by EPA, must

13 be "consistent" with the federal and state programs applicable in other states, and

14 must provide for "adequate enforcement."  *Id.*  The state-issued requirements

15 authorized by EPA operate in lieu of equivalent federally-issued requirements in

16 the federal program, and the authorized requirements become requirements of

17 RCRA Subtitle C.  42 U.S.C. §6926(b); 40 C.F.R. pt. 271.  States may adopt

18 requirements that are more stringent than federal law.  42 U.S.C. §6929.  EPA has

19 authorized the State of Washington to administer its HWMA in lieu of RCRA.  51

20 Fed. Reg. 3782 (Jan. 30, 1986).

21      Permits are generally required under RCRA and the HWMA for any facility,

22 such as Hanford, that engages in the treatment, storage, or disposal ("TSD") of

23 hazardous wastes.  There are two types of RCRA/HWMA TSD permits: an interim

24 (Part A) permit and a final (Part B) permit.  Washington Administrative Code

25 (WAC) chapter 173-303.  The permit, whether interim or final, establishes how

26 specific waste is to be managed at TSD facilities.

27

28

**ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT**-      13

1    The State, DOE, and the EPA entered into the Hanford Federal Facility
2  Agreement and Consent Order (HFFACO) in 1989, otherwise known as the Tri-
3  Party Agreement (TPA). Among the general purposes of the TPA is ensuring
4  compliance with the permitting and corrective action requirements of RCRA and
5  the HWMA. Compliance with the TPA is intended to satisfy corrective action
6  requirements of the HWMA, related corrective provisions of RCRA, and DOE's
7  obligation under CERCLA. The TPA is also a federal facility agreement under
8  CERCLA, 42 U.S.C. §9620.

9    In 1994, the State granted Hanford a sitewide permit under the
10  RCRA/HWMA for the treatment, storage, and disposal of hazardous waste. The
11  sitewide permit sets forth standards applicable to hazardous waste and the
12  hazardous component of mixed waste at each facility or unit covered by the permit.
13  Under the sitewide permit, individual units at Hanford are operating under either
14  "interim" or "final" status requirements. To date, only seven units at Hanford are
15  operating under specific final status requirements. The remaining active units
16  operate under interim status requirements. When the State of Washington
17  Department of Ecology (Ecology) approves a Part B final permit application to
18  address an additional individual unit, that modification becomes part of the
19  sitewide permit. As discussed above, the CPA would require mixed waste
20  facilities that have been granted a sitewide permit, such as Hanford, to obtain a
21  final facility permit for each unit or facility within the site where mixed wastes are,
22  or will be, stored or disposed, prior to transporting to, storing or disposing at the
23  facility any additional mixed wastes not generated at the facility. This was not a
24  requirement under the RCRA/HWMA permitting scheme.

25    In the certification proceedings before the Washington Supreme Court, the
26  parties uniformly agreed the CPA's definition of "mixed waste" does not apply to
27  materials consisting solely of radioactive source, special nuclear, or byproduct

28

**ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT**-    14

materials. *Hoffman*, 154 Wn.2d at 738.[17]  The CPA, RCW 70.105E.030(9)

(Section 3(9)), defines "mixed waste" as:

> [A]ny **hazardous substance or dangerous or extremely hazardous waste** that contains both a nonradioactive hazardous component and a radioactive component, including any such substances that have been released to the environment, or pose a threat of future release, in a manner that may expose persons or the environment to either the nonradioactive or radioactive hazardous substance.

(Emphasis added).

The state supreme court determined that this definition of "mixed waste"

expands the scope of regulated materials beyond the HWMA and the RCRA.

According to the court:

> [T]he CPA definition of mixed waste does not apply to purely radioactive Atomic Energy Act [AEA] of 1954 . . . materials. However, the CPA encompasses materials that do not 'designate' as dangerous waste through the cross-reference to RCW 70.105.010 (14) and encompasses materials that are not 'solid waste' through the cross-reference to RCW 70.105D.020(7)(b)-(d).  Thus, the CPA does expand the scope of materials currently subject to regulation as mixed waste beyond the HWMA and the RCRA.

*Id*. at 744.

"Hazardous substance" is defined in the CPA, RCW 70.105E.030(6)

(Section 3(6)), as having the same meaning as that term is defined in RCW

70.105D.020(7) of the MTCA.  RCW 70.105D.020(7)(d), states that "hazardous

substance" means:

> (a) Any dangerous or extremely hazardous waste as defined in RCW 70.105.010(5) and (6) [HWMA], or any dangerous or extremely dangerous waste designated by rule pursuant to chapter 70.105 RCW;
>
> (b) **Any hazardous substance as defined in RCW 70.105.010 (14) [HWMA]** or any hazardous substance as defined by rule pursuant to chapter 70.105 RCW;
>
> (c) Any substance that, on March 1, 1989, is a hazardous substance under section 101(14) of the federal cleanup law,

---

[17] Henceforth, when the term "mixed waste" appears in quotation marks, it is a specific reference to the definition of "mixed waste" contained in the CPA.

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT-     15**

1    42 U.S.C. Sec. 9601(14) [CERCLA];[18]

2    (d) Petroleum or petroleum products; and

3    (e) Any substance, or category of substances, including solid
     waste decomposition products, determined by the director by
4    rule to present a threat to human health or the environment if
     released into the environment.

5    (Emphasis added).

6        RCW 70.105.010(14) defines "hazardous substances" to mean "any liquid,

7    solid, gas, or sludge including any material, substance, product, commodity, or

8    waste, **regardless of quantity**, that exhibits any of the criteria of hazardous waste

9    as described in rules adopted under this chapter."  (Emphasis added).

10       The state supreme court determined that because RCW 70.105.010(14)

11   defines "hazardous substances" disjunctively to mean "any liquid, solid, gas, or

12   sludge including any material, substance, product, commodity, **or waste**," the

13   reach of the CPA extends to material that is not "discarded' and is not "waste."

14   The court concluded the CPA definition of "mixed waste" includes materials with

15   a radioactive and a non-radioactive component that do not fall within the RCRA

16   definition of "solid waste." *Hoffman*, 154 Wn.2d at 743-44.[19]  Consistent with that

17   answer, the court also concluded the CPA's "naval exemption," RCW 70.105E.080

18   (Section 8), "does not cover those materials (beyond reactor vessels or

19   compartments) that may qualify as 'mixed waste' under the CPA via the broad

20   definition of 'hazardous substance.'" *Id*. at 746.

21

22   ─────────────────

23       [18] Under CERCLA, 42 U.S.C. §9601(14), radionuclides have been
24   designated a "hazardous substance."  40 C.F.R. §§ 61.01 and 302.4.

25       [19] The CPA definition of "mixed waste" encompasses materials that are not
26   "solid wastes" under RCRA "to the extent that a 'hazardous substance,' as defined
     in RCW 70.105D.020(7)(b)-(d), fails to qualify as a 'solid waste' for lack of being
27   'discarded,' or otherwise abandoned, recycled, or inherently wastelike under 42
     U.S.C. §6903(27) and 40 C.F.R. § 261.2."  *Hoffman*, 154 Wn.2d at 743-44.
28

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT-**    16

Under RCRA, "solid waste" is defined as:

> [A]ny garbage, refuse, sludge from a waste treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities, **but does not include . . . source, special nuclear, or byproduct material as defined by the Atomic Energy Act of 1954 . . . .**

42 U.S.C. §6903(27)(Emphasis added).

"Hazardous waste" is a subset of "solid waste" and is defined under RCRA as:

> [S]olid waste, or combination of solid wastes, which because of its **quantity, concentration, or physical, chemical, or infectious characteristics may-**
>
> (A) cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or
>
> (B) pose a substantial present or potential hazard to human health, or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

42 U.S.C. §6903(5)(Emphasis added).

Prior to the CPA, the State regulated only HWMA "dangerous wastes" or "extremely hazardous wastes" which are the state-law equivalent of RCRA "hazardous wastes."[20]  Consistent with RCRA's definition of "hazardous waste," the State of Washington Department of Ecology, pursuant to the HWMA and RCRA, promulgated "Dangerous Waste Regulations," which are found at WAC Chapter 173-303.  These regulations "[d]esignate those solid wastes which are dangerous or extremely hazardous to the public health and environment."  WAC 173-303-010.  "Dangerous wastes" means solid wastes designated in WAC 173-303-070 through 173-303-100 as dangerous, or extremely hazardous or mixed

---

[20] "Under the RCRA, hazardous waste is defined as "solid waste, or [a] combination of solid wastes[,] that, for enumerated reasons, creates public health and environmental **dangers**."  *United States v. Kentucky*, 252 F.3d 816, 822 (6th Cir. 2001)(emphasis added).

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT-**     17

1  waste.  WAC 173-303-040.  "Mixed waste" is defined in these regulations as "a
2  dangerous, extremely hazardous, or acutely hazardous waste that contains both a
3  nonradioactive hazardous component and, as defined by 10 CFR 20.1003, source,
4  special nuclear, or by-product material subject to the Atomic Energy Act of 1954
5  (42 U.S.C. 2011 et seq.)."  Prior to the CPA, for certain materials to "designate" as
6  dangerous wastes, threshold quantity requirements had to be met.  *Hoffman*, 154
7  Wn.2d at 740 (citing WAC 173-303-090(8)(a)-(c)).  Under the CPA, quantity is
8  irrelevant.  The CPA's definition of "mixed waste" encompasses materials that are
9  mixtures of AEA materials and other "hazardous substances" that do not designate
10 as "dangerous waste" under existing state laws, and regardless of the quantity of
11 "hazardous substances" in the mixture.   The slightest amount of non-radioactive
12 "hazardous substances" captures the mixture under the CPA's definition of "mixed
13 waste."[21]

14       State regulation of "solid" or "hazardous waste," as those terms are defined
15 by RCRA, is clearly not preempted.  Indeed, it was never preempted, although at
16 federal facilities such regulation was barred by sovereign immunity until passage
17 of the Federal Facility Compliance Act.  As discussed above, the AEA preempts
18 regulation of AEA radionuclides for radiological safety purposes.  "Mixed waste,"
19 as that term is defined in RCRA, 42 U.S.C. §6903(41), is waste "that contains both
20 hazardous waste and source, special nuclear, or by-product material subject to the
21 Atomic Energy Act of 1954."  This is essentially the same as the definition of
22 "mixed waste" contained in the HWMA implementing regulations, cited above.

23

24       [21] The State's MTCA does not require any minimum concentration of
25 hazardous materials in order for an item to be considered a "hazardous substance."
26 *City of Seattle v. Wash. State Dept. of Transp.*, 98 Wn.App. 165, 172, 989 P.2d
27 1164 (1999).  That is consistent with CERCLA ("quantity or concentration is not a
   factor").  *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1200 (2nd Cir. 1992).
28

**ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT-     18**

1    "While the RCRA governs the disposal of hazardous waste, and the AEA

2    governs the disposal of radioactive waste, no statute specifically delegates

3    authority to regulate a mixture of the two types of waste." *United States v.*

4    *Kentucky*, 252 F.3d 816, 822 (6th Cir. 2001).  In *Kentucky*, the U.S. Department of

5    Energy (DOE) submitted a permit application to the State of Kentucky for the

6    construction and operation of a contained solid waste landfill at the Paducah

7    Gaseous Diffusion Plant operated by DOE.  A permit was issued authorizing

8    construction, and then a second permit was issued authorizing operation of the

9    landfill.  This second permit contained conditions relating to the disposal of

10   radioactive materials in the landfill, including a condition that prohibited DOE

11   from placing in the landfill "[s]olid waste that exhibits radioactivity above *de*

12   *minimis* levels," and another condition prohibiting DOE from placing in the

13   landfill "solid waste that contains radionuclides . . . until a Waste Characterization

14   Plan for radionuclides has been submitted to the Division of Waste Management

15   for review and approval."  A federal district court found DOE had presented a

16   facially conclusive claim of federal preemption, the resolution of which did not

17   require interpretation of state law or the making of factual findings.

18        The Sixth Circuit Court of Appeals affirmed, holding:

19            As the Supreme Court unequivocally stated in *Pacific Gas*
             *& Electric*, "the federal government has occupied the entire
20           field of nuclear safety concerns, except for the limited powers
             expressly ceded to the states." [Citation omitted].  Accordingly,
21           the AEA preempts any state attempt to regulate materials covered
             by the Act for safety purposes. [Citation omitted].  Here, the
22           challenged permit conditions specifically limit the amount
             of "radioactivity" and "radionuclides" that DOE may place in
23           its landfill.  The sources of such "radioactivity" and "radionuclides"
             are materials covered by the AEA, i.e., source, special nuclear,
24           and byproduct materials. [Kentucky] seeks to impose these
             conditions to protect human health and the environment.  The
25           permit conditions therefore represent an attempt . . . to regulate
             materials covered by the AEA based on . . . safety and health
26           concerns, and are thus preempted.

27   *Id*. at 823.

28        The Sixth Circuit Court of Appeals observed that "[w]hile federal law does

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT**-    19

not preempt state regulation of solid waste, [citation omitted], states may not regulate the radioactive component of solid waste." *Id*. at 824. "DOE has exclusive authority to regulate the radioactive component of waste mixtures, whereas EPA– or states authorized by EPA under the RCRA– retain the authority to regulate the non-radioactive portion." *Id*. The court then addressed whether Kentucky's permit conditions violated the federal government's sovereign immunity to state regulation of radioactive materials at federal facilities:

> While the district court did not address DOE's sovereign immunity argument in light of its holding that [Kentucky's] regulations are preempted by federal law, DOE could have prevailed on this alternate theory as well. Neither the AEA nor any other federal law waives federal immunity from regulation of federal facilities by states with respect to materials covered by the AEA. While [Kentucky] is correct to point out that the RCRA waives federal immunity to state regulation of federal facilities with respect to solid waste . . . the RCRA's definition of "solid waste" expressly excludes materials covered by the AEA.

*Id*. at 825.

So long as the State of Washington limits itself to regulating the hazardous waste component of mixed waste, as those terms are defined in RCRA, it acts within its authority.[22] The State cannot, however, regulate the AEA radioactive

_____

[22] *United States v. State of New Mexico*, 32 F.3d 494 (10th Cir.1994), which preceded *Kentucky*, also stands for the proposition that a state may exercise authority over the hazardous waste component of mixed waste, to the extent allowed by RCRA. As the *Kentucky* court noted, AEA preemption was not an issue in *New Mexico* because the question was not whether state regulation of the radioactive component of solid waste was preempted by the AEA, but rather whether certain permit conditions were within the scope of RCRA's waiver of sovereign immunity. 252 F.3d at 824. In *New Mexico*, the Tenth Circuit held the permit conditions at issue were not an attempt to "substantively regulate" radioactive waste, an acknowledgment the AEA would not allow such substantive regulation. 32 F.3d at 498-99. Instead, the permit conditions represented permissible attempts to ensure compliance with New Mexico's statutory requirements relating to regulation of hazardous waste as allowed by RCRA. *Id*.

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT-** 20

component of mixed waste.  The HWMA, as implemented by the State of
Washington through the "Dangerous Waste Regulations," is consistent with the
State's RCRA authority, and hence received the approval of the EPA.[23]
The line of authority is clearly drawn.  The United States regulates the AEA
radioactive component of mixed waste and the State regulates the hazardous waste
component.  The question is whether the CPA, under the guise of RCRA authority,
crosses the line and impermissibly regulates the AEA radioactive component of
mixed waste.

The State contends the CPA does not create new powers it did not already
possess under the HWMA, but instead eliminates the State's discretion in deciding
how to use its existing powers.  It is apparent to this court, however, that unlike the
HWMA and its implementing "Dangerous Waste Regulations" which carefully
limit their application to the hazardous waste component of mixed waste per
RCRA authority, the CPA seeks to regulate "mixed waste" as a whole, including
both the hazardous and the radioactive components.  The CPA seeks to regulate the
mixture in its entirety, rather than just the hazardous component.  In doing so, it
crosses the line and impermissibly regulates the AEA radioactive component.

The CPA exceeds RCRA authority and, as such, intrudes upon a field,
(regulation of AEA radionuclides for radiological safety purposes), which is
preempted by the AEA.  Rather than limiting itself to the regulation of "hazardous

---

[23] WAC 173-303-010 states "[t]his regulation implements chapter 70.105
RCW, the Hazardous Waste Management Act of 1976 as amended, and
implements, in part, chapters 70.105A, 70.105D, and 15.54 RCW, and Subtitle C
of Public Law 94-580, the Resource Conservation and Recovery Act, which the
legislature has empowered the department to implement."  "Subtitle C" is the
portion of RCRA dealing with "Hazardous Waste Management."

**ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT**-     21

1   waste," as that term is defined by RCRA, the CPA extends its reach to material that

2   is not solid waste, or even if solid waste, does not necessarily present a "hazard" as

3   defined in 42 U.S.C. §6903(5) because, for example, there is not enough of it to

4   constitute a "hazard."  This reveals that the true aim of the CPA is not the

5   hazardous waste component of mixed waste, but rather the radioactive component.

6   Confirming the same is the fact that Section 5(1), and other provisions noted above

7   (see n. 16 *supra*),  make no pretense of regulating simply mixed waste, but seek to

8   regulate pure AEA material.  Also confirming the same is that the CPA, through

9   CERCLA and the  MTCA, includes pure AEA radionuclides within its definition

10  of  "hazardous substances."  Therefore, the CPA's use of "hazardous substances"

11  in its definition of "mixed waste" allows (1) use of  non-radioactive hazardous

12  substances,  though not solid waste and existing in only trace amounts in the

13  mixture, as a means of regulating the AEA radionuclide component of the mixture,

14  and (2) regulation of pure AEA radionuclides that are not part of any mixture

15  because those radionuclides qualify as "hazardous substances" in themselves.

16      The defendants appear to recognize that the state supreme court's

17  interpretation of the CPA definition of "mixed waste" renders that definition

18  beyond the scope of permissible RCRA authority as exercised through the HWMA.

19  The defendants contend, however, that a completely separate issue is how they

20  interpret the CPA's "operative" provisions which is that those provisions work

21  through RCRA authority and therefore, are bounded within the confines of that

22  authority.[24]  Thus, for example, the State says its interpretation of the "operative"

23  provisions would be that it could not enforce Section 4(2)'s import moratorium

24  against materials that do not constitute solid waste.  The intervenor-defendants

25  claim they concur in that interpretation, although they concede, as they must, that

26  they do not necessarily speak for the balance of the Washington citizenry who may

27

28      [24]  The "operative" provisions are found in Sections 4, 5, 6, 7, 8, 9 and 10.

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT**-     22

1  seek to enforce the CPA per the state supreme court's interpretation of the CPA

2  definition of "mixed waste" by filing the citizen suits authorized by RCW

3  70.105E.100(1).[25]

4       The state supreme court's interpretation of the CPA definition of "mixed

5  waste" is a binding interpretation, *Reinkemeyer v. Safeco Ins. Co. of Am.*, 166 F.3d

6  982, 984 (9th Cir. 1999), based on the plain language of the CPA.  It cannot be as

7  easily and conveniently ignored as the defendants claim. It was the State who

8  persuaded this court to certify questions to the state supreme court, including those

9  relating to the CPA definition of "mixed waste."  In fact, the State represented that

10 through the certified questions it was seeking a narrowing construction of the CPA

11 which would withstand preemption and sovereign immunity challenges.[26]  Before

12 the supreme court, the State argued for a construction of the definition of "mixed

13 waste" which would have had the effect of making the CPA "co-extensive" with

14 the HWMA and RCRA.  *Hoffman*, 154 Wn.2d at 740-41.  The State obviously did

15 not succeed in getting such a narrowing construction.

16      The CPA is all about "mixed waste," as that term is defined in RCW

17 70.105E.030(9), as opposed to how that term is defined in RCRA and the HWMA

18 implementing "Dangerous Waste" regulations.  The CPA refers to "mixed waste"

19 and facilities that handle "mixed waste," rather than "hazardous waste" and

20

21      [25]  RCW 70.105E.100(1) states:

22

23          Any person may bring a civil action to compel the owner
24          or operator of a mixed waste facility to comply with the
            requirements of this chapter or any permit or order issued
25          by the department [Ecology] pursuant to this chapter; or to
            compel the department to perform any nondiscretionary duty
26          under this chapter.

27      [26]  State's brief in support of certification, Ct. Rec. 87 at p. 2.

28

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT**-    23

facilities that handle "hazardous waste."  Hazardous waste regulation, including the hazardous waste component of mixed waste, is already covered by the HWMA. The fact that the term  "facility" under the CPA is defined as having the same meaning as it has under the HWMA- "all contiguous land and structures, other appurtenances, and improvements on the land used for recycling, storing, treating, incinerating or disposing of **hazardous waste**"- does not limit the CPA to regulation of "hazardous waste" under existing law (the HWMA).  RCW 70.105E.030(4), citing RCW 70.105.010(11)(emphasis added).  The plain terms of the Section 4(2) moratorium on importation of "mixed waste" apply not just to merely "a facility," but to "**any facility owner or operator of a site** storing, managing, processing, transferring, treating or disposing of **mixed wastes**." (Emphasis added).  The "mixed wastes" referred to in Section 4(2) are those "mixed wastes" defined in the CPA at RCW 70.105E.030(9).  This is confirmed by the fact that the CPA defines "Site" as the "contiguous geographic area under the same ownership, lease, or operation where a facility is located, or where there has been a release of **hazardous substances**."  RCW 70.105E.030(14)(emphasis added).[27]  Critical "operative" provisions of the CPA refer to "hazardous substances," as opposed to "hazardous waste."  See RCW 70.105E.040(6)(a) (Section 4(6)(a)) and RCW 70.105E.060(1)(a)(ii) and (iii) (Section 6(1)(a)(ii) and (iii)).  And finally, that the CPA represents a fundamentally different approach to regulation of "mixed waste" is manifested by the fact that the "operative" provisions of the CPA require a permit not only under the HWMA, but under the CPA as well.  See RCW 70.105E.040(2) (Section 4(2)) and RCW 70.105E.060(3) (Section 6(3)).  The plain language of the CPA creates a new and separate permitting system, recognizing that the CPA seeks to regulate the entirety of the

---

[27]  Hanford undoubtedly qualifies as a "Site."  DOE is the operator of that Site.

**ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT**-    24

1    "mixed waste," rather than just its hazardous component.  If it indeed regulated

2    only the hazardous component, only an HWMA permit would be required.[28]

3        The State says it is appropriate to focus on mixed waste because the

4    presence of AEA radionuclides in mixed waste has the effect of frustrating the

5    State's exercise of hazardous waste authority under the RCRA and the HWMA.[29]

6    Be that as it may, the State cannot seek to remedy that frustration by overstepping

7    its RCRA and HWMA hazardous waste authority by means of the CPA so as to

8    frustrate the federal government's power over the radioactive component as

9    provided by the AEA.  As the *Kentucky* court recognized, no statute specifically

10   delegates authority to regulate a mixture of the two types of waste.  In the RCRA

11   itself, Congress recognized the tension that would result from the State exercising

12   its RCRA authority over the solid hazardous waste component of mixed waste and

13   the federal government exercising its authority over the AEA radioactive

14   component.  Congress addressed this tension through provisions of the Federal

15   Facility Compliance Act (FFCA), including 42 U.S.C. §6939c, "Mixed Waste

16   Inventory Reports and Plans."  Recognizing there was a concern that federal mixed

17   waste was being stored in violation of RCRA's land disposal requirements (LDRs),

18   42 U.S.C. §6924(j), Congress required federal facilities to develop mixed waste

19   inventories and site treatment plans for mixed waste, and delayed the imposition of

20

21

22

23   _____

24       [28] During oral argument, counsel for the intervenor-defendants
     acknowledged that the CPA, by mandating the State to follow its directives, allows
25   the State, through the permit process, to determine how the cleanup at Hanford
26   should proceed.

27       [29]  See Goswami Affidavit, Ct. Rec. 166 at Paragraph G; Cusack Affidavit,
     Ct. Rec. 164 at Paragraphs M and U.
28

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT-**    25

penalties so long as federal agencies comply with plan requirements.[30]  At Hanford, the TPA represents the site treatment plan for mixed waste.[31]  Counsel for the State conceded at oral argument that the TPA does, at least to some extent, relieve the tension that arises from federal and state authorities exercising authority over the different components of mixed waste.

What Congress gave to the State in terms of authority over mixed waste, as defined in the RCRA, is limited to what is found in the RCRA, as amended by the FFCA.  Congress gave the State no more authority than that, noting the State's authority is limited to regulating the hazardous waste component of mixed waste. See 42 U.S.C. §6939c(b)(2).  Congress did not give the State a blank check to regulate mixed waste based on authority over the hazardous waste component.

_____

[30] The length of storage prohibition was at issue before this court in *State of Washington v. Abraham*, CV-03-5018-AAM.  Defendants' reliance on that case is misplaced as it obviously did not involve a state law, such as the CPA,  but rather the impact of amendments to the federal WIPP Land Withdrawal Act of 1992. This court found those amendments did not have the effect of exempting TRUM (transuranic mixed waste) from the storage prohibition in the RCRA at 42 U.S.C. §6924(j), as incorporated by the State of Washington in its HWMA regulations. Consequently, preemption was not an issue because there was no conflict between federal and Washington state law.

[31] According to the January 2004 Final Hanford Site Solid (Radioactive and Hazardous) Waste Program Environmental Impact Statement, also known as the HSW EIS:

> DOE, EPA, and the State of Washington had an existing plan (i.e., the Hanford Federal Facility Agreement and Consent Order [Tri-Party Agreement] [Ecology, et al., 1989]) addressing compliance with the land disposal restrictions storage prohibition for mixed waste at the time this law [FFCA] was enacted.

(HSW EIS, Vol. 1 at p. 6.5).

**ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT-    26**

1    The CPA makes the presence of radioactive materials, whether or not a

2    component of "mixed waste," as defined by the CPA, the trigger for all of its

3    requirements.  Furthermore, the plain language of the CPA indicates all of its

4    "operative" provisions, and not just Section 5(1) discussed above, are motivated by

5    radiological safety concerns.  The "Policy" provision of the CPA, RCW

6    70.105E.020 (Section 2), states, among other things, that:  "Use of Hanford as a

7    national waste dump for **radioactive and/or hazardous or toxic wastes** will

8    increase contamination and risks;" "The economy of Washington state, from

9    agriculture to tourism, to fisheries, could be irreparably harmed from any accident

10   releasing **radiation or mixed radioactive and hazardous wastes**;" and "It is state

11   policy to protect Washington's current and future residents, particularly children

12   and other sensitive individuals, from the cumulative risks of cancer caused by all

13   cancer-causing hazardous substances, **including radionuclides**, by ensuring that

14   hazardous substance release and disposal sites meet the standards established

15   pursuant to chapter 70.105D RCW [MTCA]."  RCW 70.105E.020(1), (4) and

16   (6)(emphasis added).

17   The CPA contains a "savings clause" at RCW 70.105E.040(1) (Section 4(1))

18   that "[t]he department of ecology shall regulate **mixed wastes** to the fullest extent

19   it is not preempted by federal law, pursuant to chapter 70.105RCW [the HWMA]

20   and the further provisions of this chapter [the CPA]."  (Emphasis added).  The

21   defendants contend this is a reflection of the then-existing limitation in the HWMA

22   that "the department of ecology may regulate all **hazardous wastes**, including

23   those composed of both radioactive and hazardous components, to the extent it is

24   not preempted by federal law."  RCW 70.105.109.  (Emphasis added).  A

25   comparison of these two provisions (RCW 70.105.109 of the HWMA and RCW

26   70.105E.040(1) of the CPA) is, however, evidence in itself that the CPA takes

27   things a step further and focuses on the regulation of "mixed waste" as a whole,

28   including the AEA radioactive component.  Whereas in RCW 70.105.109, the

**ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT**-    27

reference is to regulation of "hazardous wastes," RCW 70.105E.040(1) refers not to "hazardous wastes," but to "mixed wastes." In the HWMA, the focus is on "hazardous wastes," even when it is a component of "mixed waste," whereas in the CPA, the focus is on "mixed waste," without any specific delineation of the radioactive component from the hazardous component. In any event, RCW 70.105E.040(1) does not "save" the CPA to any extent because the CPA's regulation of "mixed wastes" is effectively a regulation of the AEA radioactive component thereof for safety purposes, a field which is preempted by the AEA. It is possible the HWMA may represent the fullest extent of the permissible regulation of the hazardous component of mixed wastes, but that is a determination the court need not, and will not, make at this time.

Even if there were a non-safety rationale for the CPA, the CPA is field preempted because it has a "direct and substantial effect on the decisions made by those who build or operate nuclear facilities concerning radiological safety levels." The CPA will: (1) require DOE and the Navy to meet cleanup levels established by the State for AEA radionuclides (Section 5(1)); (2) prevent Hanford from importing "mixed waste," including classified nuclear components generated by the Navy that qualify as "mixed waste" under the CPA, until Hanford attains State-established cleanup levels for AEA materials (Section 4(6)); (3) bar the import of "mixed waste" to Hanford for a significant period of time, thereby trumping DOE's decision under the AEA that Hanford is an appropriate site for the disposal of such "mixed waste," forcing DOE to find alternative pathways for such disposal, and disrupting DOE's nationwide cleanup program for AEA materials (Section 4(2)); (4) prohibit the Navy from sending certain classified nuclear components to Hanford for disposal, thus trumping the  determination of the United States that Hanford is the appropriate site for the disposal of these AEA materials (Section

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT**-    28

4(2))[32]; (5) prevent the Pacific Northwest National Laboratory (PNNL) from importing AEA materials that are essential to important nuclear research activities (Section 4(2)); (6) require DOE to provide the Department of Ecology with "an inventory based on actual characterization of AEA materials "potentially disposed" in unlined trenches (Section 6(1)(a)(ii)); (7) prevent DOE from expanding any land disposal unit where AEA materials have been released (Section 6(2)(b)); and (8) bar DOE from using methods it has deemed appropriate for the disposal of AEA waste and the closure of tanks containing AEA waste (Section 6).

The defendants do not deny that these things could happen, but assert there is no guarantee they will depending on the State's interpretation and implementation of the CPA. There is, however, nothing for the State to interpret or substantively implement.[33] The CPA says what it says in plain, mandatory language as confirmed by the Washington Supreme Court. Forcing plaintiffs to

_____

[32] The naval exemption at Section 8(2) (RCW 70.105E.080(2)) states that nothing in the CPA "shall affect existing permits for, or in any manner prohibit, the storage or disposal of sealed nuclear reactor vessels or compartments from retired United States Navy submarines or surface ships at the existing disposal facility at Hanford, or affect existing permits for the operation of any facility by the federal government at which United States Navy Reactors are decommissioned or refueled." As discussed, in *Hoffman*, the state supreme court said this exemption does not extend to "hazardous substances" as defined in the CPA and therefore, the Navy's "mixed waste" that is not in a sealed nuclear reactor vessel or compartment (i.e., removed pumps, reactor vessels heads, and reactor core barrels) is subject to CPA regulation.

[33] The State has repeatedly stated the CPA eliminates any discretion it had before enactment of the CPA, and the intervenor-defendants agree. The CPA consists of specific and straightforward directives to the Department of Ecology. Intervenor-defendants acknowledge the CPA was prompted by dissatisfaction with Ecology's interpretation and implementation of the HWMA with regard to mixed waste, particularly such waste at Hanford.

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT**-    29

1    speculate how the CPA might be applied by the State, and to ponder the possibility

2    of citizen suits, are enough in themselves to directly and substantially affect

3    plaintiffs' decisions about AEA materials.

4         There is no ripeness issue warranting delay pending the State's

5    interpretation and implementation of the CPA.[34]  On its face, and as confirmed by

6    the state supreme court's interpretation of the CPA's definition of "mixed waste,"

7    it is clear the purpose of the CPA is to regulate AEA radionuclides, either non-

8    mixed "pure" AEA radionuclides, or the AEA radionuclide component of "mixed

9    waste," for radiological safety purposes.  In turn, the CPA directly and

10   substantially effects the decisions made by those who build or operate nuclear

11   facilities concerning radiological safety levels.  As such, the regulation of "mixed

12   waste" sought by the CPA is field preempted by the AEA.  Conflict preemption is

13   not an issue because, as discussed above, the CPA does not simply represent

14   another instance of the State exercising authority within the confines of the

15   "hazardous waste" authority granted to it by the RCRA.  The CPA goes beyond

16

17   ─────────────

18        [34] The ripeness doctrine prevents premature adjudication and is aimed at
     cases that do not yet have a concrete impact upon the parties.  *Exxon Corp. v.*
19   *Heinze*, 32 F.3d 1399, 1404 (9th Cir. 1994).  "[T]he ripeness inquiry contains both a
     constitutional and a prudential component."  *Portman v. County of Santa Clara*,
20   995 F.2d 898, 902 (9th Cir. 1993).  The constitutional component of ripeness is
     often treated under the rubric of standing, and, in many cases, coincides squarely
21   with  standing's injury in fact prong. *Thomas v. Anchorage Equal Rights*
22   *Commission*, 220 F.3d 1134, 1138 (9th Cir. 2000).  Ripeness can be characterized
     as standing on a timeline.  *Id.*  In assuring that the jurisdictional prerequisite of a
23   "case or controversy" is satisfied, it is necessary to consider whether the plaintiff
24   faces a realistic danger of sustaining a direct injury, or whether the alleged injury is
     too imaginary or speculative to support jurisdiction.  *Id.* at 1139. The prudential
25   component of the ripeness inquiry requires the court to consider the hardship to the
26   parties of withholding court consideration.  *Abbott Laboratories v. Gardner*, 387
     U.S. 136, 149, 87 S.Ct. 1507 (1967).
27

28

**ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT**-   30

1   that authority, and it is precluded from doing so by virtue of the AEA.[35]

2        Because the CPA regulates AEA materials for radiological safety purposes

3   and cannot do so, it is, by definition, invalid in every set of circumstances.  It  is

4   facially invalid under the Supremacy Clause and there are no circumstances under

5   which it can be applied constitutionally.  *Green Mountain Railroad Corp. v.*

6   *Vermont*, 404 F.3d 638, 644 (2nd Cir. 2005), *cert. denied*, 126 S.Ct. 547 (Oct. 31,

7   2005) ("The facial/as-applied distinction would be relevant only if we might find

8   some applications of the statute preempted and others not . . . . [W]here a state

9   statute is in direct conflict" with a federal statute "or one of its processes," the

10  "focus is the act of regulation itself, not the effect of the state regulation in a

11  specific factual situation").  The CPA is in "direct conflict" with the AEA itself

12  because it seeks to regulate AEA radionuclides for radiological safety purposes.

13  The focus is on this "act of regulation," not the effect of the regulation.

14

15  _____

16      [35]  See *Kentucky*, 252 F.3d at 824-25, where the Sixth Circuit Court of

17  Appeals found there was field preemption and therefore, that a conflict preemption

18  analysis was unnecessary:

19              The Supreme Court has stated that the AEA preempts the field
                of state regulation of radioactive materials.  *Pac. Gas & Electric*,
20              461 U.S. at 212, 103 S.Ct. 1713.  "When the federal government
                completely occupies a given field or an identifiable portion of it,
21              as it has done here, the test of preemption is whether 'the matter
                on which the state asserts the right to act is in any way regulated
22              by the federal government.'" *Id*. at 213, 103 S.Ct. 1713 (quoting
23              *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 236, 67 S.Ct. 1146,
                91 L.Ed. 1447 (1947)).  Under such test, DOE need not identify
24              specific conflicts between [Kentucky's] permit conditions and
25              federal law in order to establish preemption.
26

27

28

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT**-    31

### 2.  Sovereign Immunity

Because the Supremacy Clause immunizes the activities of the Federal government from State interference, direct state regulation of federal facilities is allowed only to the extent that Congress has clearly authorized such regulation. *Goodyear*, 486 U.S. at 180, n. 1, citing *Mayo v. United States*, 319 U.S. 441, 445, 63 S.Ct. 1137 (1943).

Congress has not authorized the states to regulate AEA radionuclides for radiological safety purposes at federal facilities or anywhere else.[36]  As discussed above, this includes regulation of "uncontrolled" releases of "pure" AEA radionuclides.  "Neither the AEA nor any other federal law waives federal immunity from regulation of federal facilities by states with respect to materials covered by the AEA," and while "RCRA waives federal immunity to state regulation of federal facilities with respect to solid waste . . . the RCRA's definition of 'solid waste' expressly excludes materials covered by the AEA." *Kentucky*, 252 F.3d at 825.  The CPA's regulation of AEA radionuclides, either "pure" radionuclides or as a component of "mixed waste," not only is preempted by the AEA, it violates the sovereign immunity of the United States.[37]

### 3.  Conclusion

---

[36] Under the Supremacy Clause, state regulation of private facilities centers on whether Congress has taken affirmative action to preempt the state regulation in question.  *Goodyear*, 486 U.S. at 180, n. 1.  The AEA represents affirmative action to preempt state regulation of AEA radionuclides for radiological safety purposes at private facilities and federal facilities.

[37] If the CPA regulated "mixed waste" within the confines of RCRA/HWMA authority, the court would be inclined to find such regulation is not discriminatory, even if turned out that Hanford was the only "mixed waste" facility in the State of Washington affected.

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT**-    32

The CPA is field preempted and facially invalid as a whole.  Therefore, it is unnecessary to determine whether individual sections of the CPA suffer from constitutional deficiencies apart from preemption and sovereign immunity, and whether the Contract Clause is violated.  Nevertheless, the court will identify those other deficiencies and will address the Contract Clause in an effort to lessen the likelihood of piecemeal review by the Ninth Circuit Court of Appeals.

### B. COMMERCE CLAUSE AND SECTION 4(2) OF THE CPA (RCW 70.105E.040(2))

In addition to granting Congress the power to regulate interstate commerce, the Commerce Clause has a "dormant" or "negative" aspect to it which restrains the ability of the states to discriminate against or impose substantial burdens on interstate commerce.  *Oregon Waste Sys. v. Department of Envt'l. Quality*, 511 U.S. 93, 98, 114 S.Ct. 1345 (1994).  Discrimination is "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter."  *Id*. at 99.  "Waste" is an article of commerce and state law restrictions on its flow invokes the "dormant" Commerce Clause.  *Philadelphia v. New Jersey*, 437 U.S. 617, 622-23, 98 S.Ct. 2531 (1978).  "No state may attempt to isolate itself from a problem common to the several States by raising barriers to the free flow of interstate trade."  *Chemical Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334, 339-40, 112 S.Ct. 2009 (1992).

If a state law restricting the flow of interstate commerce is facially discriminatory, or discriminatory in its purpose or effect, it is subject to a strict scrutiny test.  Under this test, discrimination against interstate commerce "is *per se* invalid, save in a narrow class of cases in which the [state] can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest."  *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 392, 114 S.Ct. 1677 (1994).  Once a plaintiff demonstrates that a regulatory scheme discriminates

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT**-    33

1  against interstate commerce, the burden shifts to the defendant to demonstrate that

2  it has no other non-discriminatory means to advance a legitimate local interest.

3  *Granholm v. Heald*,  544 U.S. 460, 125 S.Ct. 1885, 1905 (2005).

4       If a state law does not discriminate against interstate commerce, but

5  regulates evenhandedly to effectuate a legitimate local interest, a more deferential

6  standard applies.  Under the *Pike* balancing test, the state law will be upheld unless

7  the burden placed on interstate commerce is clearly excessive in relation to the

8  putative local benefits.  *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct.

9  844 (1970).

10

11       **1.  Strict Scrutiny**

12       Section 4(2) of the CPA is facially neutral in that it does not expressly

13  distinguish between offsite "mixed waste" that is generated in-state, and "mixed

14  waste" that is generated out-of-state.  It simply requires that a "final facility

15  permit" be obtained before "transporting to, storing or disposing at, the facility any

16  additional mixed wastes not generated at the facility."  For example, if Hanford is

17  the "facility," Section 4(2), on its face, says no additional mixed waste generated at

18  facilities in Washington or outside of Washington can be transported to, stored or

19  disposed at Hanford, until Hanford obtains a "final facility permit."  Therefore, the

20  question is whether Section 4(2) is discriminatory in either purpose or effect.

21       Certain language within the CPA itself clearly evidences a discriminatory

22  purpose.  RCW 70.105E.020, the "Policy" section of the CPA, states at subsection

23  (1) that  "[u]se of Hanford as a **national** waste dump for radioactive and/or

24  hazardous or toxic wastes will increase contamination and risks" (emphasis added);

25  and at subsection (2) that "[c]leanup is delayed and funds and resources diverted if

26  facilities needed to treat or clean up existing waste are used for **imported** waste,

27  and if larger facilities must be built to accommodate off-site wastes" (emphasis

28  added).  The concern expressed by the CPA is not that Hanford will be a

**ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT**-    34

1    "statewide" waste dump where other in-state facilities send their waste, but that it

2    will be a "national" waste dump where facilities in other states send their waste

3         Consistent with that concern is the naval exemption in the CPA (Section

4    8(2)) which gives certain waste generated in-state at the Puget Sound Naval

5    Shipyard (PSNS) an exemption so that it can be sent to Hanford.  While the naval

6    exemption is facially neutral in that it does not distinguish between in-state and

7    out-of-state naval facilities, it is uncontested that PSNS is the only naval facility

8    which sends waste to Hanford.  Although there is some waste generated in-state

9    that would be subject to the import moratorium, there is no question that nearly all

10   of the offsite waste which DOE intends to send to Hanford for disposal, and which

11   is therefore subject to the import moratorium, will originate from locations outside

12   the State of Washington.

13        Passage of the CPA in November 2004  followed on the heels of DOE's

14   January 2004 Final Hanford Site Solid (Radioactive and Hazardous) Waste

15   Environmental Impact Statement (HSW EIS) announcing DOE's decision to ship

16   LLW (Low Level Waste) and MLLW (Mixed Low Level Waste) to Hanford for

17   disposal, including a possible Upper Bound waste volume of 140,435 cubic meters

18   of MLLW from offsite locations outside the State of Washington.  The total Upper

19   Bound Volume of MLLW is 198,852 cubic meters, with the remainder originating

20   from in-state sources, including 58,414 cubic meters generated from the Hanford

21   Site (including the Pacific Northwest National Laboratory (PNNL)), and 3 cubic

22   meters generated from PSNS (not including sealed reactor vessels and

23   compartments which are exempt from the import moratorium).  (Ex. 6 to U.S.

24   Reply Br., Ct. Rec. 210).  Waste generated from the Hanford cleanup is not subject

25   to the import moratorium.[38]

26

27        [38] PNNL's portion of the mixed waste anticipated to be generated at Hanford

28   is 1,100 cubic meters, not all of which is cleanup waste and therefore some of

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT**-    35

1    The HSW EIS followed DOE's 1997 "Final Waste Management

2    Programmatic Environmental Impact" (WM PEIS) for managing treatment,

3    storage, and disposal of radioactive and hazardous waste at DOE installations

4    throughout the United States.  In addition to proposing Hanford as a regional

5    disposal site for LLW and MLLW, the WM PEIS contemplates that HLW (High

6    Level Waste), including HLW from Hanford, will be transported to Nevada (Yucca

7    Mountain) for disposal, and TRU (transuranic waste), including TRU from

8    Hanford, either generated there or generated elsewhere and temporarily stored

9    there, will be sent to New Mexico for disposal at the Waste Isolation Pilot Plant

10   (WIPP).  The State mounted a National Environmental Policy Act (NEPA)

11   challenge to the HSW EIS which resulted in this court preliminarily enjoining

12   shipments of LLW and MLLW to Hanford.  Subsequently, the State and DOE

13   reached a settlement agreement in CV-03-5018-AAM which calls for the

14   preparation of a new environmental impact statement with new Records of

15   Decision (RODs) to be issued pursuant thereto.  In the meantime, shipments of

16   LLW and MLLW to Hanford have been suspended.

17   In 1980, Washington voters passed Initiative 383 which prohibited

18   transportation and storage within Washington of radioactive waste produced

19   outside the state.  In *Washington State Building And Construction Trades Council,*

20   *AFL-CIO v. Spellman*, 518 F.Supp. 928 (E.D. Wash. 1981), this court found I-383

21   violated both the Supremacy Clause and the Commerce Clause. The Ninth Circuit

22   Court of Appeals affirmed that decision on appeal, 684 F.2d 627 (9th Cir. 1982).

23   It is true, as defendants concede, that I-383 was a "blunt" instrument to close

24   Washington's borders to low-level radioactive waste.  I-383 did not ban the

25   transportation for storage or the storage of waste generated in Washington, and did

26

27   which may be subject to the import moratorium.  (Affidavit of Paul Crane, Ct. Rec.

28   217 at Paragraphs 3 and 4; Skinnarland Affidavit, Ct. Rec. 172 at Paragraph 6).

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT**-    36

not ban the transportation of radioactive material through Washington for use or storage elsewhere.  I-383 overtly blocked the flow of interstate commerce at Washington's borders and on its face, discriminated against interstate commerce on the basis of origin.  518 F.Supp. at 934.[39]  While the CPA does not overtly block the flow of interstate commerce at Washington's borders, nor facially discriminate against interstate commerce on the basis of origin, it serves that purpose and has that effect.  Like I-383, the CPA effectively closes Washington's border to low-level radioactive waste, albeit in a more subtle manner and by a different mechanism, that being purported RCRA/HWMA authority regarding mixed waste.

The plain, unambiguous language of the CPA, considered in conjunction with the historical background recited above, establishes the CPA has a discriminatory purpose.  Because Section 4(2) is discriminatory in purpose, it follows that it is discriminatory in effect, the effect being that Washington, by not accepting out-of-state waste at Hanford until the cleanup of existing contamination there is complete, benefits itself while burdening "unrepresented" out-of-state interests.[40]  The burden falls disproportionately on out-of-state entities because nearly all of the mixed waste DOE plans to send to Hanford under its national

---

[39]  I-383 not only violated the "dormant" or "negative" aspect of the Commerce Clause, it amounted to an "affirmative" regulation of interstate commerce which Congress, as the holder of such power, had not authorized as evidenced by the pervasive statutory scheme which Congress had established to regulate nuclear activity.  "Congress has not granted the states the power to effectively ban the transportation for storage or the storage of radioactive waste generated outside Washington."  518 F.Supp. at 933.

[40]  The Commerce Clause "prevent[s] state governments from imposing burdens on unrepresented out-of-state interests merely to assuage the political will of the state's represented citizens."  *Conservation Force, Inc. v. Manning*, 301 F.3d 985, 988 (9th Cir. 2002).

**ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT**-    37

1  program is generated from these out-of-state entities. *South-Central Timber Dev.*
2  *Inc. v. Wunnicke*, 467 U.S. 82, 92, 104 S.Ct. 2237 (1984) (dormant Commerce
3  Clause restrictions apply where state laws impose a burden "principally upon those
4  without the state"). And while the CPA allows Washington to refuse this waste,
5  Washington, at least hypothetically, still gets to ship its HLW and TRU out-of-
6  state.[41]

7      The State asserts the CPA is not discriminatory in effect because Section 4 is
8  modeled on CERCLA's prohibition of shipment of CERCLA wastes to non-
9  compliant TSD facilities. 42 U.S.C. §9621(d)(3).[42] CERCLA, however, is a

---

11    [41] The court appreciates the concern of Washington voters that what may
12  happen is that Hanford will receive low-level waste from the other DOE sites and
    not be able to as expeditiously rid itself of its HLW and TRU because of problems
13  in New Mexico and Nevada. That, however, is irrelevant in Commerce Clause
14  analysis since the purpose of the clause is to prevent against protectionist warfare
15  among the States, whether it is waged by Washington, New Mexico or Nevada.

16    [42] §9621(d)(3) provides:

17
18          In the case of any removal or remedial action involving the
            transfer of any hazardous substance or pollutant or contaminant
19          offsite, such hazardous substance or pollutant or contaminant
20          shall only be transferred to a facility which is operating in
            compliance with section 3004 and 3005 of the Solid Waste
21          Disposal Act [42 U.S.C.A. §§ 6924 and 6925] . . . and all
22          applicable State requirements. Such substance or pollutant or
            contaminant may be transferred to a land disposal facility only if
23          the President determines that both of the following requirements
24          are met:
25
26          (A) The **unit** to which the hazardous substance or pollutant or
            contaminant is transferred is not releasing any hazardous waste,
27          or constituent thereof, into the groundwater or surface water or
28          soil.

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT-**     38

1  federal law and the Congress has power to regulate interstate commerce.  The CPA

2  is a state law subject to Commerce Clause restrictions.  CERCLA is not subject to

3  those restrictions.  While Congress can authorize State regulation of interstate

4  commerce in certain circumstances, there is nothing in 42 U.S.C. §9621(d) which

5  "unmistakably" and "clearly" authorizes anything like CPA Section 4(2).  *Maine v.*

6  *Taylor*, 477 U.S. 131, 139, 106 S.Ct. 2440 (1986) ("[T]his Court has exempted

7  state statutes from the implied limitations of the [Commerce] Clause only when the

8  congressional direction to do so has been 'unmistakably clear'").  Indeed, other

9  than pointing out the fact that §9621(d)(3) exists, the State does not cite to any

10  federal law "unmistakably" and "clearly" authorizing anything akin to Section 4(2)

11  of the CPA.[43]  Furthermore, the  EPA, in consultation with the State, has already

12  determined under CERCLA that relevant units at Hanford may receive waste from

13  other sites (including out-of-state sites).  (See Ex. 7 attached to reply brief of

14

15

16  _____

17          (B) All such releases from **other units** at the facility are being

18          controlled by a corrective action program approved by the the
           Administrator [of EPA] under subtitle C of the Solid Waste

19          Disposal Act [which is part of RCRA].

20

21  (Emphasis added).

22          As noted above, under CERCLA, radionuclides are considered a "hazardous
   substance."

23

24  [43] Section 4(2) of the CPA, while perhaps modeled on CERCLA, 42 U.S.C.

25  §9621(d)(3), is certainly not identical thereto.  Section 4(2) prohibits import of
   waste to the entire Hanford Site, based on a release anywhere at the facility or

26  within the site,  whereas CERCLA allows EPA to permit transfers of waste if there
   has not been a release at the particular receiving unit at the facility or within the

27  site, and other units at the facility or within the site are subject to a corrective

28  action program.

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT**-    39

1 | United States, Ct. Rec. 210).[44]

2 |      The effect of a challenged state statute is evaluated "not only by considering
3 | the consequences of the statute itself, but also by considering how the challenged
4 | statute may interact with the legitimate regulatory regimes of the other States and
5 | what effect would arise if not one, but many or every [state] adopted similar
6 | legislation." *Healy v. Beer Institute*, 491 U.S. 324, 336, 109 S.Ct. 2491 (1989).
7 | The State of Washington says that if other states pass laws similar to the CPA, it
8 | would mean only that other states have elected to use their regulatory authority
9 | over mixed waste and cleanup to embody cleanup policy contained in CERCLA's
10 | offsite prohibition. The CPA, however, goes much further than CERCLA in the
11 | scope of its offsite prohibition. If other states start passing legislation similar to the
12 | CPA, the simple fact is that DOE will not be moving waste anywhere among its
13 | nationwide sites as it proposes to do as part of its nationwide cleanup program.

14 |      Because the plaintiffs have met their burden of establishing discrimination,
15 | the burden shifts to defendants to demonstrate under "rigorous scrutiny" that there
16 | are no other non-discriminatory means to advance a legitimate local interest.
17 | While the defendants identify what they believe is the "legitimate local interest,"
18 | that being the public health and welfare of the citizens of the State of Washington,
19 | they make no attempt to prove there are no means, other than Section 4(2), to
20 | advance that interest. Instead, defendants contend the court must hold a fact-
21 | finding trial to determine whether Section 4(2) withstands strict scrutiny. In order
22 | to justify an evidentiary hearing, it is incumbent upon the defendants to produce at

23 | _____

24 |    [44] The court **GRANTS** the State's motion for leave to file the supplemental
25 | affidavit of Einar R. Skinnarland (Ct. Rec. 225), and it has considered the
26 | affidavits submitted by the United States in response thereto. The court merely
27 | points out the fact that EPA has made this determination and in doing so, does not
     intend any comment upon the wisdom of that determination in light of the
28 | circumstances that existed when the determination was made, or that exist now.

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT**-    40

1    least some evidence raising a genuine issue of material fact that there are no means,

2    other than Section 4(2), to advance the local interest.  See *Waste Management*

3    *Holdings, Inc. v. Gilmore*, 252 F.3d 316, 343 (4th Cir. 2001)("Because defendants

4    have presented no evidence as to why a narrower capping statute would not

5    adequately address the identified health and safety concerns for Virginia citizens,

6    the Defendants fail to survive the Plaintiffs' motion for summary judgment with

7    respect to the second prong of the strict scrutiny test").[45]  Defendants have

8    produced no evidence, and moreover, do not refute the assertion that the TPA is in

9    fact another means of advancing the public health and safety interest.

10   Section 4(2) fails the "strict scrutiny" test and is therefore invalid under the

11   Commerce Clause.

12

13   **2. *Pike* Balancing Test**

14   Because Section 4(2) fails the "strict scrutiny" test, there is no need to

15   engage in the *Pike* balancing test.  Assuming, however, that Section 4(2) regulates

16   interstate and intrastate commerce evenhandedly, this court would find that it fails

17   the balancing test.

18   The defendants contend that in light of the legitimate local interest served by

19

20   [45] *Conservation Force, Inc. v. Manning*, 301 F.3d 985, 999 (9th Cir. 2002), is

21   cited by the State for the proposition that whether a challenged law serves a clear

     local benefit, and there are no less discriminatory means to accomplish that benefit,

22   are questions of fact which can only be decided after an evidentiary hearing.  The

23   case, however, does not say an evidentiary hearing is always necessary.  The Ninth

24   Circuit Court of Appeals simply reversed a district court decision finding there was

     no Commerce Clause violation, and remanded to the district court to determine, in

25   the first instance, whether there were any other less discriminatory means to

26   accomplish the legitimate local interest.  Although the court indicated this was a

27   "question of fact," it did not say this question of fact could not be decided as a

     matter of law on summary judgment where no genuine issues of material fact exist.

28

**ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT**-    41

Section 4(2), that of safeguarding the public, any impact on interstate commerce is "incidental." The defendants say the "only out-of-state impacts identified by Plaintiffs relate to DOE's ability to freely ship waste among its various sites." The defendants assert the CPA does not prevent DOE from shipping waste to Washington and that if Washington continues to be a desirable place for mixed waste disposal, the United States or a private entity could construct a "compliant" mixed waste facility in Washington. Thus, according to the defendants, any impact on DOE's ability to ship new waste to Hanford is incidental to the CPA's goal of achieving effective cleanup of contaminated sites, such as Hanford.

"If safety justifications are not illusory, the Court will not second-guess legislative judgment," however, "the incantation of a purpose to promote the public health or safety does not insulate a state law from Commerce Clause attack." *Kassel v. Consolidated Freightways Corp.*, 450 U.S. 662, 670, 101 S.Ct. 1309 (1981). This is particularly true where the state law is the product of the initiative process and not the more detailed and deliberate approach normally associated with the state legislature. *Spellman*, 518 F.Supp. at 934.

Assuming there is a non-illusory legitimate local interest and benefit advanced by it, Section 4(2) has more than just an incidental effect on interstate commerce, and it burdens said commerce excessively in comparison to the putative local benefit. Because of its expanded definition of "mixed waste" to incorporate "hazardous substances" which are not "waste," Section 4(2) has the effect of preventing the importation of useful products from out-of-state sources for research and national security projects.

Furthermore, the availability of Hanford for disposal of MLLW is an essential component of DOE's nationwide cleanup program since it is undisputed that some federally-generated MLLW cannot be disposed at commercial facilities, either because it is classified for national security reasons, or because it is higher activity waste which cannot be accepted under current commercial licenses. (Triay

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT**-    42

1  Declaration at Paragraph 10, Ct. Rec. 137-12).  The Nevada Test Site, DOE's other

2  preferred site for disposal of LLW and MLLW,  can accept offsite higher activity

3  LLW for disposal, but Hanford is the only federal facility currently permitted to

4  receive offsite MLLW for disposal.  (Triay Declaration at Paragraph 12).

5      The defendants assert the plaintiffs' arguments about excessive burden really

6  amount to nothing more than allegations that it will be more costly and less

7  convenient to ship MLLW to other locations, citing *Valley Bank of Nevada v. Plus*

8  *System, Inc.*, 914 F.2d 1186, 1193 (9th Cir. 1990)("commerce clause does not give

9  an interstate business the right to conduct its business in what it considers to be the

10  most efficient manner").  Cost and convenience undoubtedly factor into DOE's

11  national program, but it must also be kept in mind that the stated goal of the

12  program is to clean up nuclear waste nationwide and that in doing so, the

13  individual states are assigned respective benefits and burdens.  Says Dr. Ines Triay,

14  Chief Operating Officer for Environmental Management for DOE:

15      [E]quity issues are a significant and practical consideration in
   the selection and use of Federal disposal facilities.  DOE selected
16  two regional disposal facilities through it WM PEIS and RODs to
   balance the impact on the sites and host States.  The availability
17  of two Federal facilities also provides needed disposal contingency
   in the event that one site becomes unavailable, without rendering
18  DOE wholly dependent on commercial industry capabilities.

19  (Triay Declaration at Paragraph 10).

20      The State and others are not pleased with the selection of Hanford as a

21  disposal facility for MLLW.  The fact is, however, that the federal government is

22  entitled to make the selection, subject to NEPA scrutiny.  The State cannot enact a

23  law which frustrates that selection in a manner that violates the Commerce Clause.

24  Decisions which need to be made at a national level addressing national concerns

25  cannot be trumped by protectionist regulations enacted by individual states.

26  Indeed, it may well be that at some point, the Commerce Clause will benefit

27  Washington in that other states will be told they cannot prevent out-of-state HLW

28  and/or TRU from being sent to those states for disposal because it would frustrate

**ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT**-    43

1   DOE's nationwide cleanup program.

2

3       **C.  SUPREMACY CLAUSE AND SECTION 9 OF THE CPA**

4           **(RCW 70.105E.090)**

5       The United States contends Section 9 of the CPA imposes charges on the

6   federal government that are unreasonable, unrelated to regulatory services, and

7   assessed in a discriminatory manner in contravention of RCRA's limited waiver of

8   immunity at 42 U.S.C. §6961(a).

9       With respect to "reasonable service charges," §6961(a) provides:

10          The reasonable service charges referred to in this subsection
            include, but are not limited to, fees or charges assessed in
11          connection with the processing and issuance of permits,
            renewal of permits, amendments to permits, review of plans,
12          studies, and other documents, and inspection and monitoring
            of facilities, as well as any other nondiscriminatory charges
13          that are assessed in connection with a Federal, State, interstate,
            or local solid or hazardous waste regulatory program.
14
15      Section 9(4) of the CPA (RCW 70.105.090(4)) provides for a "mixed waste

16  surcharge" in addition to the service charge established by RCW 70.105.280 of the

17  HWMA.  This surcharge is intended to fund "[l]ocal government and public

18  participation grants" for "[a]ssistance in public review of **mixed waste** permit,

19  closure, and clean-up decisions; and . . . review of, and public comment on, site

20  budgets, compliance costs and funding priorities."  Section 9(4)(a)(emphasis

21  added).  The surcharge is calculated based on a  percentage of the annual clean-up

22  budget of a facility or site.

23      Section 9(5) (RCW 70.105E.090(5)) provides that:

24          For federal facilities with releases of mixed wastes or
            hazardous substances owned or operated [by] a federal
25          agency, such as Hanford, the annual site clean-up budget
            shall be determined by the department [Ecology], for
26          purposes of this section, based on the greater of the
            congressional budget request or appropriations of the
27          federal government for activities at the site related to
            cleanup or waste management.
28
        The United States contends the surcharge is not a "service charge" under

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT**-    44

1  RCRA because Hanford and other mixed waste facilities are already subject to
2  service charges established under the HWMA for: 1) office staff, and staff support
3  for the purposes of facility or unit permit development, review, and issuance; and
4  2) actions taken to determine and ensure compliance with the HWMA.  RCW
5  70.105.280(2).

6      Based on the court's finding that the CPA seeks to regulate more than just
7  the hazardous waste component of "mixed waste" within the confines of its RCRA
8  and HWMA authority, it follows that there is no reasonable basis for the CPA's
9  surcharge.  The State already collects a service charge for its regulation of
10 hazardous waste, including the hazardous component of mixed waste, within the
11 confines of its RCRA and HWMA authority.  It cannot collect an additional charge
12 for regulating "hazardous substances" and "mixed waste" as a whole, including the
13 radioactive component thereof, because it has no authority under the  RCRA or
14 HWMA to regulate those things.

15     If the surcharge qualified  as a proper "regulatory" charge within the scope
16 of RCRA's waiver of immunity, it would still have to: (1) not discriminate against
17 federal functions; (2) be based on a fair approximation of use of the system; and
18 (3) be structured to produce revenues that will not exceed the total cost to the state
19 government of the benefits to be supplied.  *Massachusetts v. United States*, 435
20 U.S. 444, 466-67, 98 S.Ct. 1153 (1978).

21     Defendants claim Section 9(5) is not *per se* discriminatory although it
22 applies only to federal facilities in providing that the annual cleanup budget for
23 such  facilities, upon which the surcharge is to be calculated, is "the greater of the
24 congressional budget request or appropriations of the federal government."  Citing
25 *Washington v. United States*, 460 U.S. 536, 546, 103 S.Ct. 1344 (1983), defendants
26 note that a purportedly discriminatory measure may merely be an accommodation
27 to federal constraints.  Defendants assert that the provision for determining the
28 federal government's annual cleanup budget simply recognizes the distinction

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT**-    45

1   between how a cleanup budget is calculated for the federal government versus how
2   it is calculated for other parties.  The distinction, say the defendants, lies in the
3   uncertainty inherent in the federal budget because of the need for congressional
4   appropriation.  Private parties and the State do not rely on congressional
5   appropriation.

6       It appears Section 9(5) is a response to the situation where DOE requests a
7   certain amount of money for cleanup and the Congress ends up appropriating less
8   than that amount.  DOE can request all the money it says it needs for Hanford, but
9   ultimately it is subject to whatever Congress decides to appropriate.  Should DOE
10  be penalized where Congress appropriates less than requested?  Section 9(5)
11  appears to lump DOE and Congress together.  Narrowing the focus to  just
12  "facilities," it is obvious that non-federal mixed waste facilities are treated better
13  than federal facilities because for non-federal facilities, the surcharge is based on
14  what is actually appropriated and spent on cleanup (the actual budget versus the
15  "budget request"), whereas for federal facilities, it is the budget request or the
16  appropriation, whichever is higher.  Only federal facilities may be assessed a
17  surcharge based on a figure that is higher than the amount actually spent on
18  cleanup.  This court concludes the mere fact that federal facilities depend upon
19  Congressional appropriation is not sufficient justification to treat those facilities
20  differently than non-federal facilities for the purpose of calculating the surcharge.

21      If the surcharge qualified  as a proper "regulatory" charge within the scope
22  of RCRA's waiver of immunity, this court would still strike down Section 9(5) as
23  being unjustifiably discriminatory against federal functions.

24
25      **D.  SUPREMACY CLAUSE AND SECTION 7 OF THE CPA**
26          **(RCW 70.105E.070)**
27  RCW 70.105E.070 provides in relevant part:
28          The department [of Ecology] shall require, as a condition for

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT**-    46

any permit issued pursuant to the provisions of chapter 70.105 RCW [HWMA] or this chapter [CPA] for facilities storing, treating or disposing of **mixed wastes**, and at which **hazardous substance** releases have occurred, and remedial or corrective action has not been completed, that the site owner or operator disclose annually to the department [of Ecology] the projected total and annual cost of each project or action required to meet the provisions of **each applicable federal or state law governing investigation, cleanup, corrective action, closure, or health and safety of the facilities at the site**; and if, the owner or operator is a state or federal agency, the budgets or budget requests for such purposes for the owner's current fiscal year and each of the upcoming three fiscal years. Where the owner of a site is a federal agency, the annual disclosure shall be provided to the department within fourteen days of: Submission of the agency's budget request to Congress; final appropriation of funds; **and at the time any field request is submitted to the agency's head-quarters for funding in fiscal years beyond the current fiscal year.** The disclosures to the department required by this section shall include, at a minimum, a comparison of the cost estimate for all activity required by compliance orders, decrees, schedules, or agreements, with the funds requested and the funds appropriated. The owner or operator shall provide additional detail on projected costs and the budgets at the request of the department.

(Emphasis added).

Like Section 9, Section 7 imposes requirements on the federal government that are unrelated to the State's hazardous waste program and therefore, extends beyond RCRA's waiver of immunity. The State can regulate hazardous waste, including the hazardous waste component of mixed waste, pursuant to its RCRA and HWMA authority. It cannot, however, regulate "mixed waste," as defined by the CPA, nor can it regulate "hazardous substances" because such regulation is preempted by the AEA and in violation of the sovereign immunity of the United States. The disclosure requirements of Section 7 apply to facilities storing, treating or disposing of "mixed wastes," as defined by the CPA, and at which "hazardous substance releases" have occurred. Accordingly, Section 7, like the rest of the CPA, violates the Supremacy Clause.

The United States contends that Section 7 would require DOE to disclose preliminary budget requests forwarded from field offices to DOE Headquarters, or from DOE to the President, in violation of executive branch privileges, including

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT**-    47

1   the deliberative process privilege.  Each budget year, DOE's program and field

2   offices, such as Hanford, develop annual budgets and submit requests to DOE

3   Headquarters where DOE senior management reviews the requests and then

4   transmits the agency's compiled budget request to the Office of Management and

5   Budget (OMB), and eventually to the President.  OMB directives require that all

6   federal agencies maintain the confidentiality of all budgetary materials that lead to

7   the President's congressional budget submissions.  Once Hanford submits its

8   request to Headquarters, the United States says DOE invokes an "embargo" on all

9   budget deliberations and decisions.

10          "To fall within the deliberative process privilege, a document must be both

11  predecisional and deliberative."  *Carter v. United States Dep't of Commerce*, 307

12  F.3d 1084, 1089 (9th Cir. 2002).  Predecisional documents include

13  "recommendations, draft documents, proposals, suggestions, and other subjective

14  documents" that "reflect the personal opinions of the writer rather than the policy

15  of the agency."  A predecisional document is deliberative if "disclosure of [the]

16  materials would expose an agency's decisionmaking process in such a way as to

17  discourage candid discussion within the agency and thereby undermine the

18  agency's ability to perform its function."  *Id*.  A predecisional document is not

19  deliberative if disclosure "poses a negligible risk of denying to agency

20  decisionmakers the uninhibited advice which is so important to agency decisions."

21  *National Labor Relations Bd. (NLRB) v. Sears, Roebuck & Co.*, 421 U.S 132, 152

22  n. 19, 95 S.Ct. 1504 (1975).

23          The State contends that field requests submitted to agency headquarters are

24  not protected by the privilege because they are budget appropriation requests, not

25  budget deliberations, encompassing objective economic information that compares

26  cost estimates for cleanup projects to requested funds.  The State, however,

27  provides no indication of how it would really know what is encompassed in these

28  field requests, and makes no effort to address the OMB directives cited by the

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT**-    48

1   United States which emphasize the confidentiality of "underlying materials" which
2   lead to the President's budget decisions.  Section 22.1 of OMB Circular No. A-11
3   (2004) states: "Do not release agency justifications provided to OMB and any
4   agency future year plans or long-range estimates to anyone outside the Executive
5   Branch, except in accordance with this section."  (Ct. Rec. 137-5).  Examples of
6   "confidential budget information," according to the OMB, include "an agency
7   component's budget requests to the agency, the agency's budget requests to OMB,
8   and OMB's passback to the agency."  (OMB Memoranda 01-17, Ct. Rec. 137-6).
9   According to the OMB, "[s]ince the Budget has been submitted, it is important that
10  the Executive Branch's internal deliberations regarding the various issues and
11  options that were considered in the process leading to the President's decisions
12  should remain a matter of internal record."  *Id.*

13          Pursuant to the TPA, DOE has voluntarily agreed to provide certain
14  preliminary budget information to Ecology and EPA.  Ecology and EPA have
15  agreed to keep such information confidential, and DOE has reserved its right to
16  prevent disclosure of such information.  According to the United States, Section 7
17  of the CPA would make disclosure of such information mandatory with no
18  assurance of confidentiality.  The intervenor-defendants also note the existence of
19  these TPA provisions, asserting they are "closely mirrored" by Section 7.
20  Intervenor-defendants say Section 7 was enacted in response to DOE's failure
21  since 2003 to provide Hanford field office budget requests to Ecology and EPA
22  and that "[t]he CPA addresses DOE's breach of the TPA by mandating disclosures
23  when required by current law and review by providing citizens standing to sue to
24  enforce future violations."

25          The intervenor-defendants assert the CPA requires factual comparisons of
26  funds needed to meet cleanup requirements with actual funds requested, and that
27  the TPA itself specifies that analytical data shall not be claimed as confidential.
28  Clearly, however, Section 7 makes no attempt to limit itself to such "factual,"

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT**-    49

1  "analytical" data (even assuming that data would not be protected by the privilege).

2  Section 7 provides:

> The disclosures to the department required by this section shall include, **at a minimum**, a comparison of the cost estimate for all activity required by compliance orders, decrees, schedules, or agreements, with the funds requested and the funds appropriated.  **The owner or operator shall provide additional detail on projected costs and the budgets at the request of the department [of Ecology]**.

7  (Emphasis added).

8  If there is such a clear-cut violation of the TPA, as suggested by the

9  intervenor-defendants (but not by the State it is noted), the court must ask why

10  there has not been an effort to enforce the TPA.  The TPA has enforcement

11  mechanisms and indeed, is enforceable by "any person"/ "any affected citizens."

12  (Ex. C. to Segal Declaration, Ct. Rec. 145, at pp. 25-26).[46]  Apparently dissatisfied

13  with the TPA and perhaps not entirely convinced there is a breach of the same, the

14  proponents of the CPA included Section 7 to make the financial disclosures

15  mandatory with no assurance of confidentiality.  Section 7, however, infringes

16  upon the federal government's deliberative privilege.  The United States has met

17  its burden of demonstrating deliberative privilege with respect to the agency field

18  requests to DOE Headquarters, and from DOE Headquarters to the President.  On

19  this basis, Section 7 would also have to be struck down.

21  **E.  CONTRACT CLAUSE**

22  Article I, Section 10 of the United States Constitution provides that "No

23  State shall . . . pass any . . . Law impairing the Obligation of Contracts."

---

[46] Assurances of this were relayed in a letter by the U.S. Department of Justice to then Director of Ecology, Christine Gregoire.  This letter was attached to the TPA so as to become part of the agreement.  See p. 54 and n. 49, *infra*.

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT**-    50

1  Intervenor-plaintiff TRIDEC[47] asserts that the CPA substantially impairs: (1) the

2  TPA; (2) Battelle contracts with DOE (known as the 1830 and 1831 contracts); and

3  (3) Framatome's contracts with private customers.  TRIDEC moves for "partial"

4  summary judgment on the basis that these particular contracts are substantially

5  impaired by the CPA.

6      Whether a state law operates as an unconstitutional impairment of a

7  contractual relationship is answered by a three step inquiry: (1) whether there is a

8  contractual relationship; (2) whether a change in the law impairs the relationship;

9  and (3) whether the impairment is substantial.  *Gen. Motors Corp. v. Romein*, 503

10  U.S. 181, 186, 112 S.Ct. 1105 (1992).  "Substantial impairment" does not require

11  that the law entirely destroy the contract.  *S. Cal. Gas Co. v. City of Santa Ana*, 336

12  F.3d 885, 890 (9th Cir. 2003).  An "impairment of a . . . contract is substantial if it

13  deprives a private party of an important right, thwarts performance of an essential

14  term, [citation omitted], defeats the expectations of the parties, [citation omitted],

15  or alters a financial term. . . ."  *Id.*  If there is a "substantial impairment," then it

16  must be determined "whether the impairment is both reasonable and necessary to

17  fulfill an important public purpose."  *Seltzer v. Cochrane*, 104 F.3d 234, 236 (9th

18  Cir. 1996).  The State has the burden of establishing that its law "is both reasonable

19  and necessary to an important public purpose."  *City of Santa Ana*, 336 F.3d at 894.

20   An impairment will not be considered necessary if an "evident and more moderate

21  course would serve [the State's] purpose equally well."  *United States Trust Co. of*

22

23  _____

24      [47] The Tri-City Industrial Development Council (TRIDEC) is a non-profit
    organization whose stated mission is to achieve economic stability and balanced

25  growth in the Tri-Cities through the retention and creation of jobs and the
    enhancement of the quality of life for those who live there.  TRIDEC's members

26  include CH2M Hill Hanford Group, Inc. (CH2M Hill), Battelle Memorial Institute
    (Battelle), and Framatome ANP, Inc. (Framatome).  TRIDEC is an official liaison

27  to DOE on economic issues.

28

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT-**    51

1    *N.Y. v. New Jersey*, 431 U.S. 1, 31, 97 S.Ct. 1505 (1977).  Laws that work an

2    "impairment of a State's own contracts . . . face more stringent examination under

3    the Contract Clause then would laws regulating contractual relationships between

4    private parties."  *Allied Structural Steel Co. v. Spannus*, 438 U.S. 234, 244 n. 15,

5    98 S.Ct. 2716 (1978).

6         The State challenges standing of TRIDEC and its members to claim

7    impairment of the TPA.  TRIDEC and its members are not parties to the TPA, and

8    the State asserts they are also not intended third party beneficiaries.  The State

9    contends there is nothing in the TPA evidencing intent by the contracting parties to

10   assume a direct obligation to TRIDEC or any of its members at the time the TPA

11   was entered.  *Hairston v. Pacific 10 Conference*, 101 F.3d 1315, 1320 (9th Cir.

12   1996).

13        The State cites two provisions of the TPA in support of this argument.  TPA

14   Art. II, Paragraph 13, provides:

15           DOE remains obligated by this Agreement regardless of
     whether it carries out the terms through agents, contractors,

16   and/or consultants.  Such agents, contractors, and/or consultants
     shall be required to comply with the terms of this Agreement,

17   but the Agreement shall be binding and enforceable only
     against the parties to the Agreement.

18   TPA Art. XLVI, Paragraph 140, states:

19
             EPA and Ecology shall not be held as a Party to any contract
20   entered into by DOE to implement the requirements of this
     Agreement.

21
22        Neither of these provisions explicitly exclude TRIDEC and its members

     from being considered third-party beneficiaries of the TPA.  The latter provision
23
     (TPA Art. XLVI, Paragraph 140) simply says EPA and Ecology, who are parties to
24
     the TPA, shall not be bound as parties to any contract DOE has with its contractors
25
     to implement the TPA.  Thus, for example, if Battelle claims DOE breached a
26
     contract those two had, Battelle's sole recourse is to sue DOE on the contract.
27
     Battelle cannot sue EPA and/or Ecology to recover on or enforce the DOE contract
28

**ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT-    52**

between Battelle and DOE. That does not mean, however, that Battelle, as a third party beneficiary cannot sue EPA and/or Ecology for a breach of the TPA. With regard to the first provision cited (TPA Art. II, Paragraph 13), all that says is that DOE is bound to the terms of the TPA, and the TPA is binding and enforceable only against the parties to the TPA (Ecology, EPA and DOE). Conversely, the TPA is not binding and enforceable against non-parties, such as DOE's contractors. DOE, not any of its contractors, is accountable to Ecology and/or EPA if the contractors are not doing the job with the result that DOE is not meeting TPA milestones. DOE can, in turn, sue its contractors for breach of underlying contracts with these contractors, but cannot sue those contractors for breach of the TPA.

The State acknowledges the TPA, also known as the Hanford Federal Facility Agreement and Consent Order (HFFACO)), has a contractual element, citing *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 226 n. 10, 95 S.Ct. 926 (1975)("consent decrees are treated as contracts for some purposes but not others"), and that intended third-party beneficiaries have standing to enforce consent orders and decrees as contracts.[48] Whether a contractual third-party beneficiary is created is based on "objective intent" and "the court should construe the contract as a whole, in light of the circumstances under which it was made." *Hairston*, 101 F.3d at 1320. TRIDEC notes that attached and included as part of the TPA is a letter Washington Governor Gregoire, then the Director of Ecology, received from the U.S. Department of Justice assuring her that "the agreement [the TPA] is binding and enforceable . . . by the State of Washington and any affected

---

[48] See also *Hook v. State of Arizona, Dept. of Corrections*, 972 F.2d 1012, 1014 (9th Cir. 1992) ("Consent decrees are essentially contractual agreements that are given the status of a judicial decree. Contract principles are generally applicable in our analysis of consent decrees, provided contract analysis does not undermine the character of the judicial decree").

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT-**    53

1  citizens." (Ex. C to Ct. Rec. 145).[49]   Indeed, the terms of the TPA, Paragraph 9 at

2  p. 6, require DOE to provide a copy of the TPA to all of its contractors who

3  perform work under the TPA.  In the absence of anything in the TPA expressly

4  including or excluding third-party beneficiaries, the court finds the fact that

5  "affected citizens" can enforce the TPA constitutes objective intent that TRIDEC

6  and its members are intended beneficiaries of the TPA.  *Smith v. Cent. Ariz Water*

7  *Conservation Dist.*, 418 F.3d 1028, 1035 (9th Cir. 2005) ("intended beneficiary

8  need not be specifically or individually identified in the contract, but must fall

9  within a class clearly intended by the parties to benefit from the contract").

10      The State contends that even if TRIDEC and its members have standing, the

11  terms of the TPA defeat their impairment claims because TPA Art. L, Paragraph

12  157, provides:

13        In any judicial challenge arising under this Agreement the
         court shall apply the law in effect at the time of the challenge,
14        including any amendments to RCRA or CERCLA enacted after
         entry of this Agreement.  Where the law governing this agree-
15        ment has been amended or clarified, any provision of this agree-
         ment which is inconsistent with such amendment or clarification
16        shall be modified to conform to such change or clarification.

17      The CPA is not an "amendment" or "clarification" of law existing at the

18  time the TPA was entered.  It is an entirely new law.  Moreover, the Contract

19  Clause means nothing if the State can unilaterally modify the TPA, a contract to

20  which it is a party, simply by passing a new law (the CPA).  The State cannot

21  escape Contracts Clause scrutiny in this fashion.  *University of Hawaii*

22  *Professional Assembly v. Cayetano*, 183 F.3d 1096, 1107 (9th Cir. 1999).

23  ("[C]ontract clause of the Federal Constitution limits the ability of a State, or

24  subdivision of a State, to abridge its contractual obligations without first pursuing

25

26      _____

27      [49] The letter also goes on to say that "the agreement has the advantage of
    being enforceable by any 'person', whereas a consent decree is generally
28    enforceable only by the parties to the litigation."

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT**-   54

1    other alternatives").

2         The TPA memorializes a series of milestones that deal with disposal,

3    cleanup and final closure of waste tanks.  Milestone M-45 requires single-shell

4    tank closure by 2024, and Milestone M-62 requires that waste in tanks will be

5    treated by 2028.  TRIDEC says that as a result of the CPA's regulation of "mixed

6    waste," the 2028 deadline will be virtually impossible to meet.  CH2M Hill, the

7    prime contractor at Hanford, estimates the CPA will add 20 years to existing TPA

8    schedules.

9         The State contends any claim of impairment based on Section 6(3) of the

10   CPA[50] is speculative and unripe.  According to the State, Section 6(3) dictates

12        [50] Section 6(3) (RCW 70.105E.060(3)) provides:

14             Determinations and permit actions, pursuant to chapter
15             70.105 RCW or this chapter, relating to the closure of
             tank systems consisting of one or more interconnected
16             tanks in which mixed wastes are currently, or were, stored,
             shall be made by the department [Ecology] only after
17             consideration of the cumulative impacts of all tank
18             residuals and leaks from such systems at the site pursuant
             to chapter 43.21 C RCW.  Actions may not be taken to
19             close individual tanks, or which may prevent the retrieval
20             of residual mixed wastes remaining in a tank, in any
             element of the tank system, or in the soil due to leaks
21             from the tank system, prior to compliance with this
22             section and determination of the quantity, nature, and
             potential impacts from such residuals or releases.  In no
23             event may the department allow the use of a landfill
24             closure for mixed waste tank systems prior to all
             potentially effective and practicable actions having
25             been taken to characterize, and remediate, releases and
26             potential releases.  The department may require research
27             and development technologies for characterization or

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT-    55**

1  certain considerations if underground tanks are "landfill closed," but M-45 is silent
2  concerning the method by which tank closure is to be achieved.  Ecology has yet to
3  determine whether Hanford's tanks will be "clean closed" or "landfill closed."
4  Furthermore, the State asserts there is the strong prospect that DOE will breach
5  both M-45 and M-62 for reasons unrelated to the CPA.

6          It is not apparent why it makes any difference whether the tanks will be
7  "landfill closed" or "clean closed."  Regardless of what is ultimately decided,
8  Section 6(3) would have an effect on the ability of contractors to comply with
9  existing TPA schedules.  This is because of the expanded regulation of the CPA
10 and because Section 6(3) appears to pertain to any type of tank closure.  It is not
11 necessary to wait until Ecology determines whether it will "landfill close" or
12 "clean close" the tanks (not until at least 2008[51]), or until 2024 or 2028, to
13 determine if ability to comply with existing TPA schedules has in fact been
14 impaired.

15         Possible breaches of the TPA by DOE because of failures of the contractors
16 do not make those contractors' Contract Clause claims unripe.  Potential breach by
17 DOE is an entirely different issue to be addressed by the terms of the TPA and its
18 dispute resolution procedures.  The question here is whether the CPA impairs
19 existing State contractual obligations under the TPA, not whether the contractors'
20 own failures (in spite of the CPA) impair their ability to meet the TPA milestones.

21

22                    retrieval pursuant to this section.
23

24

25        [51] Laura J. Cusack, Ecology's TPA Administrator, says a decision cannot be
26 made until after DOE's environmental impact statement analyzing clean closure
27 and landfill closure approaches to tank closure.  This environmental impact
   statement is not expected earlier than 2008.  (Cusack Affidavit at Paragraph S, Ct.
28 Rec. 164).

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT**-    56

The CPA has a present concrete impact on TRIDEC and its members.  There is no uncertainty as to what the CPA seeks to accomplish, as is evident from this court's preemption and sovereign immunity analysis.  The CPA fundamentally alters and expands the nature of the State's regulation of "mixed waste" at Hanford.  In doing so, it jeopardizes the ability of DOE's contractors to meet the TPA deadlines which were negotiated prior to enactment of the CPA.  (See Declaration of Dale I. Allen, Ct. Rec. 144).  Indeed, the defendants do not dispute that, instead opting to rely on ripeness arguments based on alleged uncertainty in the application and enforcement of the CPA.

Battelle's contracts with the federal government, and Framatome's contracts with private entities, are also impaired by the CPA because the CPA's expanded definition of "mixed waste" prevents Battelle and Framatome from importing "useful products" (non-waste products).  The CPA inhibits Battelle's ability to import the necessary materials from the University of Missouri used by IsoRay to conduct prostate cancer research.  (See Declaration of James L. Buelt, Ct. Rec. 143).  The CPA prohibits Framatome from importing uranium hexafluoride and enriched uranium.  (See Declaration of Ronald J. Land, Ct. Rec. 142).

The Contract Clause claims asserted by TRIDEC are not only ripe, the undisputed material facts of record establish as a matter of law that the TPA, and Battelle's and Framatome's contracts, are presently "substantially impaired."  The CPA has "in fact, operated as a substantial impairment of a contractual relationship."  *Rui One Corp. v. Berkeley*, 371 F.3d 1137, 1147 (9th Cir. 2004), *cert. denied*, 125 S.Ct. 895 (2005).  In addition, defendants have not made any effort to establish that  impairment by the CPA is both reasonable and necessary to fulfill an important public purpose.  Defendants have failed to establish the absence of an evident and more moderate course of action that would serve the public purpose equally well.

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT**-    57

**F. SEVERABILITY**

Severability is not an issue.  The entire CPA is preempted by the AEA and violates sovereign immunity in that it regulates AEA radioncuclides (either non-mixed AEA radionuclides or the AEA radioactive component of "mixed waste") without a waiver of such immunity (either under RCRA, CERCLA, or any other federal law).  The CPA is facially invalid and cannot be applied constitutionally in any circumstance.

Apparently, there are no non-AEA radionuclides at Hanford which might qualify for regulation as waste and which would therefore conceivably be subject to regulation as "mixed waste" under the CPA.  The fact there may be non-AEA radionuclides at other facilities subject to regulation by the CPA is not a sufficient basis for leaving the CPA intact, since the primary, if not the exclusive, purpose of the CPA is to regulate "mixed waste" at Hanford.  The state supreme court recognized as much in its statement in *Hoffman* that:

> The CPA contains several distinct provisions but, as a general matter, was drafted to prevent the addition of new radioactive and hazardous waste to the Hanford nuclear reservation until the cleanup of existing contamination is complete.

154 Wn. 2d at 734, citing RCW 70.105E.010 (purpose section of the CPA).

The court has pointed out unique deficiencies with respect to certain sections of the CPA (Section 4(2) violates the Commerce Clause; Section 7 violates the deliberative process privilege; Section 9(5) unjustifiably discriminates against federal facilities with regard to the calculation of the "mixed waste" surcharge).  Even if the CPA as a whole could withstand field preemption and sovereign immunity challenges, there are independent reasons for striking down Section 4(2), Section 7 and Section 9(5) which would make a severability analysis  relevant.  The court will not speculate about that analysis, however.

**IV.  CONCLUSION**

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**-    58

Defendants cannot divorce the "operative" provisions of the CPA (Sections 4, 5, 6, 7, 8, 9 and 10) from the "Purpose," "Policy" and "Definitions" sections (Sections 1, 2 and 3). The "Purpose," "Policy" and "Definitions" sections manifestly reveal that the CPA seeks to regulate "mixed waste" as a whole for safety purposes, including the AEA radioactive component of such waste, in contravention of the AEA, and in contravention of the RCRA which limits the State's authority to the hazardous waste component. Confirmation of this is found in the "operative" provisions (i.e., Section 5(1)'s "direct" regulation of "pure" AEA radionuclides, and references in Sections 4 and 6 to "hazardous substances" and the obtaining of a "mixed waste" permit under the CPA in addition to a "hazardous waste" permit under the HWMA). The defendants can say the CPA does not provide the State with any more authority than the HWMA, but that is contrary to the plain language of the CPA, as confirmed by the state supreme court's answers to the certified questions. The CPA is facially invalid as a whole because regulation of AEA radionuclides for radiological safety purposes is preempted by the AEA, and RCRA does not allow such regulation either.

The court does not intend in the slightest to diminish the concerns of Washington voters regarding the present and future management of nuclear waste at Hanford. These are very legitimate concerns in light of the volume of waste already at Hanford and the existing contamination problems. Congress has said, however, that it is the federal government which must address the issue of nuclear safety with regard to AEA materials, including as it relates to the AEA radioactive component of mixed waste. Congress has limited the State's authority to the hazardous waste component of mixed waste. Because those components are inextricably intertwined, tension is created. Congress has recognized this tension and addressed it in the RCRA, making clear that although the State cannot regulate the radioactive component, the federal government is obliged to include the State in the formulation of a plan to address mixed waste at federal facilities. At

**ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT**-    59

1   Hanford, this plan is embodied in the TPA.

2       Whether the State can exercise any additional authority under the

3   RCRA/HWMA over the hazardous waste component of mixed waste is not clear,

4   but what is clear is that the CPA exceeds the boundaries of that authority.  At

5   present, the State and its citizens must content themselves with exercising

6   hazardous waste authority under the HWMA, enforcing the duties and obligations

7   of the United States under the TPA, and enforcing any other duties and obligations

8   of the United States under CERCLA and any other applicable federal law.

9       The motion of the United States for summary judgment (Ct. Rec. 136),

10  joined in by intervenor-plaintiffs Fluor and TRIDEC, is **GRANTED**.  The CPA is

11  hereby declared invalid in its entirety as being in violation of the Supremacy

12  Clause.  In addition, Section 4(2) is declared invalid as being in violation of the

13  dormant Commerce Clause;  Section 7 is declared invalid as being in violation of

14  the deliberative process privilege; and Section 9(5) is declared invalid as

15  discriminating against the United States in violation of the RCRA waiver of

16  immunity.

17      TRIDEC's motion for partial summary judgment (Ct. Rec. 140) is

18  **GRANTED**.  It is hereby declared that the CPA substantially impairs the TPA,

19  Battelle Memorial Institute's 1830 and 1831 contracts with DOE, and Framatome's

20  private contracts, in violation of the Contract Clause.

21      The "partial" summary judgment granted to TRIDEC on the Contract Clause

22  claims technically means there are Contract Clause claims of other TRIDEC

23  members left to adjudicate, although there is little doubt the court would find

24  substantial impairment of the contracts of those members, as well.

25      Accordingly, pursuant to Fed. R. Civ. P. 54(b), this court hereby certifies

26  there is no just reason for delay of entry of final judgment and expressly directs the

27  District Executive to enter judgment for the plaintiffs in accordance with this order.

28

**ORDER GRANTING MOTION**
**FOR SUMMARY JUDGMENT**-    60

1    **IT IS SO ORDERED**.  The District Executive shall enter this order and

2    forward copies of the order and the judgment to counsel of record.

3

4    DATED this ___12th___ day of June,  2006.

5

6    ____s/ Alan A. McDonald_____
                ALAN A. McDONALD
7               Senior United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT-    61**

1
2
3

## GLOSSARY OF SELECTED ACRONYMS

4  AEA- Atomic Energy Act of 1954 (42 U.S.C. §2011 et seq.)
5
6  CERCLA- Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. §9601 et seq.)
7
8  CPA- Cleanup Priority Act (RCW Chapter 70.105E)
9  DOE- United States Department of Energy
10
11  EPA- United States Environmental Protection Agency
12  FFCA- Federal Facility Compliance Act of 1992 (Part of RCRA pursuant to amendment of RCRA)
13
14  HFFACO- Hanford Federal Facility Agreement and Consent Order, also known as the Tri-Party Agreement (TPA).
15
16  HWMA- Hazardous Waste Management Act (RCW Chapter 70.105)
17
18  LLW- Low-level waste
19  MLLW- Mixed low-level waste
20
21  MTCA- Model Toxics Control Act (RCW Chapter 70.105D)
22  NEPA- National Environmental Policy Act (42 U.S.C. §4231 et seq.)
23
24  RCRA- Resource Conservation and Recovery Act of 1976, amended by the Hazardous and Solid Waste Amendments of 1984, also known as the Solid Waste Disposal Act (42 U.S.C. §6901 et seq.)
25
26  TPA- Tri-Party Agreement
27
28

**ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT**-    62